J-A22011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CAROLINA LEMUS-ALMANZA, | |
| Appellant | No. 2511 EDA 2017 |

Appeal from the Judgment of Sentence Entered May 10, 2017
In the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-CR-0004239-2015

BEFORE:  BENDER, P.J.E., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:            **FILED DECEMBER 13, 2018**

Appellant, Carolina Lemus-Almanza, appeals from the judgment of sentence of an aggregate term of 18-36 years' incarceration, imposed following her guilty plea to multiple sexual offenses that were committed against her infant daughter.  After careful review, we reverse the order designating Appellant as a Sexually Violent Predator ("SVP"), remand for the sole purpose of having the trial court issue the appropriate notice under 42 Pa.C.S. § 9799.23 as to Appellant's sexual offender registration requirements, but otherwise affirm her judgment of sentence.

The Commonwealth summarized the facts of this case at Appellant's guilty plea hearing as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

Your Honor, the facts are as follows: [Appellant], along with her boyfriend, Alejandro Sanchez Torres, engaged in the sexual abuse of their biological daughter, ASL, from, approximately, January 1st of 2014 through October 13th, 2015, in Kennett Square, Chester County, when the victim was between the ages of six months to two years old. The sexual abuse occurred at [Appellant]'s two different residences. …

Both co-defendants digitally penetrated the child's vagina and rectum on multiple occasions, and touched the child's sexual or intimate body parts with their hands and mouths; both took naked images of the child for their sexual gratification with their cell phones. [Appellant] sent the co-defendant numerous naked images of the child in a variety of lewd and lascivious poses upon his request.

During the year and a half of abuse, they would routinely place the child on their bodies while they engaged in sexual intercourse with each other and would also touch the child's sexual or intimate body parts simultaneously.

Co-defendant Sanchez Torres solicited [Appellant] to allow him to engage in vaginal and anal intercourse with the child. This solicitation was made through a Facebook exchange between the co-defendants in mid-October, 2015, but, according to [Appellant], did not happen because on or around October 12th, 2015, a friend of [Appellant] discovered this Facebook conversation, along with the images of the child that were in a private conversation between the two on their Facebook accounts where they discussed other sexual acts they were interested in performing on the child, including oral, vaginal, and anal sex.

This friend reported that [conversation] to the police the following day and the Facebook messages between the two and the naked images of the child were recovered by police.

On October 13th, 2015, Chester County Detective Oscar Rosado, who then worked at the Kennett Square Police Department, interviewed [Appellant]. She admitted that she had taken naked images of her daughter and sent them to the co-defendant for his sexual gratification upon his request. She confessed that she had touched her daughter's vagina with her fingers and on multiple occasions with her mouth. She also told the officer that she needed help.

She stated that the co-defendant also touched the victim's vagina and anus with his fingers. [Appellant] also indicated she had touched the child's anus with her fingers as well [as her] mouth on multiple occasions, and that the co-defendant had taken at least eight or nine naked images of the child while in [Appellant]'s presence.

[Appellant] later disclosed that she and the co-defendant engaged in sexual assaults of the victim almost every time they had sex, which occurred, approximately, one to two times a week for over a year and a half.

N.T. Plea, 6/2/16, at 4-7.

On June 2, 2016, Appellant entered an open guilty plea to two counts of aggravated indecent assault, 18 Pa.C.S. § 3125(b); six counts of conspiracy, 18 Pa.C.S. § 903; and one count each of indecent assault, 18 Pa.C.S. § 3126(a)(7); sexual abuse of children, 18 Pa.C.S. § 6312(b) (production of child pornography); sexual abuse of children, 18 Pa.C.S. § 6312(c) (dissemination of child pornography); and endangering the welfare of children, 18 Pa.C.S. § 4304(a). Following Appellant's plea, the trial court ordered an evaluation by the Sexual Offender Assessment Board ("SOAB"). N.T. Plea at 34. Sentencing was deferred in order for Appellant to fulfill her agreement to cooperate with the Commonwealth in the trial against her co-defendant, Alejandro Sanchez Torres.

Sentencing occurred on May 10, 2017. At the outset of that hearing, the trial court received evidence that the SOAB issued a report recommending that the court designate Appellant as an SVP. N.T. Sentencing, 5/10/17, at 3. Appellant did not contest the designation but, to the contrary, accepted it without objection. *Id.* at 3. Accordingly, the trial court entered an order

- 3 -

determining Appellant to be an SVP, but did not conduct an SVP hearing. SVP

Order, 5/10/17, at 1 (single page). The court also sentenced Appellant as

follows:

- Count 1–aggravated indecent assault of a child—a term of imprisonment of 5 to 10 years.

- Count 2—aggravated indecent assault of a child—a term of imprisonment of 5 to 10 years, consecutive to count 1.

- Count 5—indecent assault of a child less than 13 years of age—a term of imprisonment of 1 to 2 years to be served consecutive to count 2.

- Count 7—sexual abuse of children, dissemination of child pornography—a term of imprisonment of 1 to 2 years to be served consecutive to count 5.

- Count 13—sexual abuse of children, production of child pornography—a term of imprisonment of 1 to 2 years to be served consecutive to count 7.

- Count 17—endangering the welfare of children—a term of imprisonment of 1 to 2 years to be served concurrent with count 13.

- Count 18—conspiracy to commit aggravated indecent assault of a child—a term of imprisonment of 5 to 10 years, consecutive to count 13.

- Count 19—conspiracy to commit aggravated indecent assault of a child—a term of imprisonment of 5 to 10 years, concurrent with count 18.

- Count 20—conspiracy to commit indecent assault of a child—a term of imprisonment of 1 to 2 years to be served concurrent with count 18.

- Count 21—conspiracy to commit sexual abuse of children— a term of imprisonment of 1 to 2 years to be served concurrent with count 18.

- Count 22—conspiracy to commit sexual abuse of children— a term of imprisonment of 1 to 2 years to be served concurrent with count 18.

- Count 23—conspiracy to commit endangering the welfare of children—a term of imprisonment of 1 to 2 years to be served concurrent with count 18.

Trial Court Opinion ("TCO"), 11/13/17, at 5-6.

Appellant filed a timely post-sentence motion seeking reconsideration of her sentence, which the trial court denied on June 29, 2017. Appellant then filed a timely notice of appeal, and a timely, court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued its Rule 1925(a) opinion on November 13, 2017.

Appellant now presents the following questions for our review:

1. Did the [t]rial [c]ourt err and abuse its discretion, and/or violate Appellant's [c]onstitutional rights by illegally treating [her] as a[n] [SVP] for sentencing purposes; despite the fact that she did not undergo an interview and analysis-which would have shown she is not a[n] [SVP]?

2. Did the [t]rial [c]ourt err and exercise a manifest abuse of discretion in regard to discretionary aspects of sentencing by ignoring or misapplying the law, exercising its judgment for reasons of partiality, prejudice, bias or ill will against Appellant, and/or arriving at a manifestly unreasonable decision regarding the offenses, so that it imposed an unreasonably excessive sentence with multiple consecutive sentences without fairly and adequately considering the mitigating circumstances raised and asserted?

Appellant's Brief at 8.

In Appellant's first claim, she baldly asserts that she would not have been deemed an SVP by the trial court had she participated in her SVP assessment by the SOAB. This claim dangerously approaches frivolity, and is saved only by its mootness. First, Appellant refused to cooperate with the SOAB during the SVP assessment process. *See* TCO at 32 (noting that

- 5 -

Appellant "was given the opportunity to be interviewed by the SOAB, but she declined to participate"). Second, Appellant conceded through counsel that she was an SVP at the sentencing hearing. N.T. Sentencing at 3. Accordingly, any claim that the trial court failed to conduct a hearing, or that the SVP determination was made under an inappropriate standard of proof, is frivolous. At best, Appellant conceivably has a claim for the ineffective assistance of counsel, but no such claim could have been raised on direct appeal under the circumstances of this case. *See Commonwealth v. Holmes*, 79 A.3d 562 (Pa. 2013).

Nevertheless, Appellant's claims concerning the SVP determination process are rendered moot by our recent decision in *Commonwealth v. Butler*, 173 A.3d 1212 (Pa. Super. 2017). In *Butler*, we concluded that, because our Supreme Court, in *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017), *cert. denied*, 138 S.Ct. 925 (2018), held that the Sexual Offender Registration and Notification Act's ("SORNA")[1] registration requirements are punitive, and an SVP designation increases the registration period, trial courts cannot apply SORNA's increased registration requirement for SVPs because SORNA does not require a fact-finder to determine, beyond a reasonable doubt, that the defendant is an SVP. *Butler*, 173 A.3d at 1217-18 (citing *Alleyne v. United States*, 570 U.S. 99 (2013)). Thus, Appellant's SVP status effectively constitutes an illegal sentence. Therefore, we vacate the order

---

[1] 42 Pa.C.S. §§ 9799.10-9799.41.

designating Appellant to be an SVP, and remand this matter to the trial court to issue appropriate notice of her registration obligations pursuant to 42 Pa.C.S. § 9799.23.

In Appellant's second issue, she argues the trial court abused its sentencing discretion "by ignoring or misapplying the law, improperly considering factors, and arriving at a manifestly unreasonable judgment resulting in excessive consecutive sentences." Appellant's Brief at 29 (unnecessary capitalization omitted).

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Hoch*, 936 A.2d 515, 517–18 (Pa. Super. 2007) (citation omitted). However,

> [c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. *Commonwealth v. Sierra*, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
> > [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

- 7 -

> *Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra*, *supra* at 912-13.
>
> As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors. *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006). An appellant must articulate the reasons the sentencing court's actions violated the sentencing code. *Id.*

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010).

Instantly, Appellant filed a timely notice of appeal, and preserved her sentencing claim in a post-sentence motion. She also provided a Rule 2119(f) statement in her brief. We also conclude that she presents a substantial question for our review. "This Court has held that a claim that the sentence is excessive because the trial court relied on impermissible factors raises a substantial question." *Commonwealth v. Simpson*, 829 A.2d 334, 338 (Pa. Super. 2003); *see also Commonwealth v. Derry*, 150 A.3d 987, 995 (Pa. Super. 2016) (recognizing a "claim that 'a sentence is manifestly excessive such that it constitutes too severe a punishment raises a substantial question'") (quoting *Commonwealth v. Kelly*, 33 A.3d 638, 640 (Pa. Super. 2011)). Accordingly, we may reach the merit of Appellant's sentencing claim.

- 8 -

We have reviewed the parties' briefs, the certified record, and the trial court's responsive Rule 1925(a) opinion.  In that opinion, the Honorable Phyllis R. Streitel addressed Appellant's multi-part sentencing issue in detail, set forth the relevant law, and determined that the issue lacked merit.  **See** TCO at 5-32.  We agree with the trial court's analysis, and adopt it as our own.  Accordingly, we conclude that Appellant's second claim lacks merit.

Judgment of sentence **affirmed**.  SVP order **vacated**.  Case **remanded** for proceedings consistent with this memorandum.  Jurisdiction **relinquished**. Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/13/18

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

vs

: CRIMINAL ACTION

CAROLINA LEMUS-ALMANZA : NO. 4239-15

: SUPERIOR CT. NO. 2511 EDA 2017

## STATEMENT OF THE COURT

On July 31, 2017, Defendant filed a timely appeal following the court's denial of Defendant's Post Sentence Motions on June 29, 2017. An appeal having been taken, pursuant to Pa.R.A.P. 1925(a), the following statement is submitted.

Defendant was arrested following acts that occurred between January 1, 2014 through October 13, 2015. She was charged with the following thirty-four counts of criminal conduct: two counts of aggravated indecent assault, in violation of 18 Pa.C.S.A. § 3125(a)(1), (7) and (b); two counts of unlawful contact with minor, in violation of 18 Pa.C.S.A. § 6318(a)(1); two counts of indecent assault, in violation of 18 Pa.C.S.A. § 3126(a)(1), (7); six counts of sexual abuse of children, in violation of 18 Pa.C.S.A. § 6312(c), (d); three counts of sexual abuse of children, in violation of 18 Pa.C.S.A. § 6312(b); corruption of minors, in violation of 18 Pa.C.S.A. § 6301(a)(1)(ii); endangering welfare of children, in violation of 18 Pa.C.S.A. § 4304(a)(1); and seventeen counts of conspiracy, in violation of 75 Pa.C.S.A. § 903(c).

These charges were the result of an investigation that began on October 13, 2015, after a third party discovered disturbing Facebook instant messages between Defendant and her co-Defendant about sexual acts they performed on Defendant's then 2 year old

daughter. The discovery was reported immediately to the police. (It was originally thought that the victim was the biological daughter of both Defendant and co-defendant but a DNA test performed during the investigation concluded that the co-defendant was not the victim's father.) When questioned by police, Defendant confessed to committing these sexual acts on the victim for sexual gratification. Further investigation found that the sexual assaults began when the victim was six months old and continued for one-and-a-half years.

On June 2, 2016, Defendant entered an open guilty plea to the following: two counts of aggravated indecent assault, in violation of 18 Pa.C.S.A. § 3125(b); indecent assault, in violation of 18 Pa.C.S.A. § 3126(a)(7); sexual abuse of children, in violation of 18 Pa.C.S.A. § 6312(b); sexual abuse of children, in violation of 18 Pa.C.S.A. § 6312(c); endangering welfare of children, in violation of 18 Pa.C.S.A. § 4304(a); and conspiracy, in violation of 75 Pa.C.S.A. § 903.

The facts set forth in support of the plea were set forth at the hearing as follows:

The defendant Carolina Lemus-Almanza, along with her boyfriend, Alejandro Sanchez Torres, engaged in the sexual abuse of their biological daughter, ASL, from approximately, January 1st of 2014 through October 13th, 2015, in Kennett Square, Chester County, when the victim was between the ages of six months to two years old. The sexual abuse occurred at the defendant's two different residences. The first is at 322 East Linden Street, Apartment A, and also at 400 West State Street.

Both co-defendants digitally penetrated the child's vagina and rectum on multiple occasions, and touched the child's sexual or intimate body parts with their hands and mouths; both took naked images of the child for their sexual gratification with their cell phones. The defendant sent the co-defendant numerous naked images of the child in a variety of lewd and lascivious poses upon his request.

During the year and a half of abuse, they would routinely place the child on their bodies while they engaged in sexual intercourse with each other and would also touch the child's sexual or intimate body parts simultaneously.

Co-defendant Sanchez Torres solicited the defendant to allow him to engage in vaginal and anal intercourse with the child. This solicitation was made through a Facebook exchange between the co-defendants in mid-October, 2015, but, according to the defendant, did not happen because on or around October 12th, 2015, a friend of the defendant discovered this Facebook conversation,

2

along with the images of the child that were in a private conversation between the two on their Facebook accounts where they discussed other sexual acts they were interested in performing on the child, including oral, vaginal, and anal sex.

This friend reported that to the police the following day and the Facebook messages between the two and the naked images of the child were recovered by police.

On October 13th, 2015, Chester County Detective Oscar Rosado, who then worked at the Kennett Square Police Department, interviewed the defendant. She admitted that she had taken naked images of her daughter and sent them to the co-defendant for his sexual gratification upon his request. She confessed that she had touched her daughter's vagina with her fingers and on multiple occasions with her mouth. She also told the officer that she needed help.

She stated that the co-defendant also touched the victim's vagina and anus with his fingers. The defendant also indicated she had touched the child's anus with her fingers as well and mouth on multiple occasions, and that the co-defendant had taken at least eight or nine naked images of the child while in the defendant's presence.

The defendant later disclosed that she and the co-defendant engaged in sexual assaults of the victim almost every time they had sex, which occurred, approximately, one to two times a week for over a year and a half.

The defendant violated her duty of care and protection of a victim by engaging in this sexual abuse.

(N.T., 6/2/16, pgs. 4-7).

Thereafter, during the plea hearing, Defendant agreed that the facts as set forth were true and confirmed that she did these acts. (N.T., 6/2/16, pgs. 17-18).

Defendant was sentenced on May 10, 2017. She filed two timely Post Sentence Motions on May 19, 2017. A hearing was held on June 20, 2017. An Order was entered on June 29, 2017 denying Defendant's request for reconsideration and disposition of sentence and her request to modify and reduce the sentence.

On July 31, 2017, Defendant filed a Notice of Appeal. On August 1, 2017 an Order was entered directing defense counsel to file a Concise Statement of Errors Complained of on Appeal within twenty-one (21) days. Defendant's statement was filed on August 15, 2017. She raised four issues on appeal, all revolving around the sentence she received and the determination that she is a sexually violent predator.

Defendant's first argument on appeal is that "[t]he honorable trial court erred and

3

abused its discretion, as well as denied Defendant's due process, by not considering Defendant's extreme circumstances of duress and coercion by co-defendant Sanchez-Torres regarding the offenses in question, as explained during Defendant's post-sentence motion; circumstances which were not explained by Defendant's original counsel nor heard by the court during sentencing."

Defendant's second argument on appeal is that "[t]he honorable trial court erred and abused its discretion, as well as denied Defendant's due process, by treating Defendant as a sexually violent predator for sentencing purposes, despite the fact that Defendant was not allowed the important opportunity to undergo a sexually violent predator interview and analysis – which would have shown she is not a sexually violent predator."

Defendant's third argument on appeal is that "[t]he honorable trial court erred and exercised a manifest abuse of discretion in regard to discretionary aspects of sentencing by ignoring or misapplying the law, exercising its judgment for reasons of partiality, prejudice, bias or ill will against Defendant – as shown on the record by its particular disgust of the offenses in question – and/or arriving at a manifestly unreasonable decision regarding the offenses, so much so that it imposed an unreasonably excessive sentence with multiple consecutive sentences without fairly and impartially considering the mitigating circumstances raised and asserted."

Defendant's fourth argument on appeal is that "[t]he Defendant's sentence should be modified because it is unreasonably excessive in light of Defendant's circumstances of extreme duress and coercion via physical assault and abuse by co-defendant Sanchez-Torres against her regarding the offenses in question, as well as Ms. Lemus-Almanza's

4

guilty plea, full cooperation with the Commonwealth, and key testimony against Sanches-Torres during his trial – all of which were not fairly or adequately considered by the honorable trial court."

We disagree with Defendant's argument that her sentence was excessive. In the spirit of thoroughness and candor to the appellate court, this court spent a considerable amount of time analyzing the evidence and preparing for the sentencing hearing. We can articulate many of the reasons for the sentence imposed and can refute Defendant's argument that the sentence is excessive.

A sentencing hearing was held on May 10, 2017. At that proceeding, one of the first issues addressed was the fact that the State Sexual Offender Assessment Board determined that Defendant met the criteria of a sexually violent predator. When asked by the court if the defense was going to challenge that assessment or accept it, defense counsel reported that the assessment was accepted by the defense. (N.T., 5/10/17, p. 3).

Defendant was sentenced as follows:

- Count 1 –aggravated indecent assault of a child - a term of imprisonment of 5 to 10 years.
- Count 2 – aggravated indecent assault of a child – a term of imprisonment of 5 to 10 years, consecutive to count 1.
- Count 5 – indecent assault of a child less than 13 years of age – a term of imprisonment of 1 to 2 years to be served consecutive to count 2.
- Count 7 – sexual abuse of children, dissemination of child pornography - a term of imprisonment of 1 to 2 years to be served consecutive to count 5.
- Count 13 – sexual abuse of children, production of child pornography - a term of imprisonment of 1 to 2 years to be served consecutive to count 7.
- Count 17 – endangering the welfare of children - a term of imprisonment of 1 to 2 years to be served concurrent with count 13.
- Count 18 – conspiracy to commit aggravated indecent assault of a

5

child - a term of imprisonment of 5 to 10 years, consecutive to count 13.

- Count 19 – conspiracy to commit aggravated indecent assault of a child - a term of imprisonment of 5 to 10 years, concurrent with count 18.
- Count 20 – conspiracy to commit indecent assault of a child - a term of imprisonment of 1 to 2 years to be served concurrent with count 18.
- Count 21 – conspiracy to commit sexual abuse of children - a term of imprisonment of 1 to 2 years to be served concurrent with count 18.
- Count 22 – conspiracy to commit sexual abuse of children - a term of imprisonment of 1 to 2 years to be served concurrent with count 18.
- Count 23 – conspiracy to commit endangering the welfare of children - a term of imprisonment of 1 to 2 years to be served concurrent with count 18.

Therefore, Defendant's overall sentence of incarceration was for a term of 18-36 years. In addition, Defendant was ordered to undergo a mental health evaluation and follow recommended treatment. Defendant was ordered to have no unsupervised contact with children who are 16 years old or younger and ordered to have no contact with the victim, unless the victim so wishes. It must also be noted that Defendant was given credit for time served from October 14, 2015 to May 10, 2017.

In accordance with 42 Pa.C.S.A. § 9781(a), a defendant or the Commonwealth may appeal as of right the legality of a sentence. However, Defendant does not challenge the legality of the sentence. Defendant only alleges that her sentence was excessive and alleges that the court failed to consider the mitigating circumstances. Therefore, Defendant is challenging the discretionary aspects of sentencing to which there is no automatic right to appeal. Commonwealth v. Titus, 816 A.2d 251, 254 (Pa.Super. 2003), citing Commonwealth v. Koren, 646 A.2d 1205, 1207 (Pa.Super.

6

1994).

42 Pa.C.S.A. § 9781(b) states that a defendant or the Commonwealth may file a petition for allowance of appeal of the discretionary aspects of a sentence for a felony or a misdemeanor. That allowance of appeal may be granted at the discretion of the appellate court where it appears that there is a substantial question that the sentence imposed is not appropriate. 42 Pa.C.S.A. § 9781(b). Considering the nature and number of the charges, the evidence surrounding the criminal acts, including Defendant's own testimony in her co-defendant's trial and the evidence presented by the Commonwealth and Defendant at sentencing, this court submits that there is no substantial question about the appropriateness of the sentence.

In accordance with 42 Pa.C.S.A. § 9781(c), there are three circumstances under which the appellate court shall vacate the sentence and remand the case to the sentencing court with instructions, which are as follows:

(1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;
(2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or
(3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

Pennsylvania law has established that sentencing is within the sound discretion of the sentencing judge, and that a sentence will not be disturbed absent a manifest abuse of discretion. Commonwealth v. Mouzon, 828 A.2d 1126, 1128 (Pa. Super. 2003), citing Commonwealth v. Johnson, 666 A.2d 690 (Pa. Super. 1995). "To constitute an abuse of discretion, the sentence imposed must either exceed the statutory limits or be manifestly excessive." Mouzon, 828 A.2d at 1128, quoting

7

Commonwealth v. Gaddis, 639 A.2d 462, 469 (Pa.Super. 1994), app. denied, 649 A.2d 668 (Pa. 1994).

An abuse of discretion in sentencing is not established merely by an error in judgment. Mouzon, 828 A.2d at 1128, citing Commonwealth v. Kocher, 602 A.2d 1308 (Pa. 1992). Rather, the defendant "must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." Mouzon, 828 A.2d at 1128, citing Commonwealth v. Rodda, 723 A.2d 212 (Pa.Super. 1999). See also Commonwealth v. Griffin, 804 A.2d 1, 7 (Pa.Super. 2002).

When a defendant claims that a sentence is manifestly excessive, great weight must be given to the sentencing court's discretion because it is in the best position to measure factors such as the nature of the crime, a defendant's character, and a defendant's display of remorse, defiance, or indifference. Mouzon, 828 A.2d at 1128, citing Commonwealth v. Ellis, 700 A.2d 948, 958 (Pa.Super. 1997), app. denied, 727 A.2d 127 (Pa. 1998).

The sentencing guidelines are merely advisory, and a defendant may be sentenced outside of the guidelines so long as the court places its reasons for the deviation on the record. Mouzon, 828 A.2d at 1128, citing Cunnigham, 805 A.2d 566, 575 (Pa.Super. 2002). However, the use of the sentencing guidelines is not voluntary and they must be applied unless the circumstances of an individual case require deviation. Commonwealth v. Eby, 784 A.2d 204, 209 (Pa.Super. 2001), citing Commonwealth v. Gause, 659 A.2d 1014 (Pa.Super. 1995). The "adoption of the guidelines was not intended to preclude judicial discretion." Commonwealth v. Minott,

8

577 A.2d 928, 930 (Pa.Super. 1990), citing Commonwealth v. Frazier, 500 A.2d 158 (Pa.Super. 1985).

The only constraints placed upon a court's discretion in sentencing matters are that the sentence imposed must be within statutory limits and the record must show that the court considered the sentencing guidelines and adhered to the following standard: the sentence imposed should call for confinement consistent with the protection of the public, gravity of the offense, and the rehabilitative needs of the defendant. Commonwealth v. Minott, 577 A.2d at 930-931, citing Commonwealth v. Stalnaker, 545 A.2d 886 (Pa.Super. 1988). This court imposed a sentence in conformity with this standard.

In addition, "[o]ur Supreme Court has ruled that where pre-sentence reports exist, the presumption will stand that the sentencing judge was both aware of and appropriately weighed all relevant information contained therein." Griffin, 804 A.2d at 8, citing Commonwealth v. Devers, 546 A.2d 12, 18 (Pa. 1988). At the outset of the sentencing hearing, the court stated that for sentencing it considered the presentence investigation report that was compiled in this case. Defendant did make a correction to the report, which the court noted. (N.T., 5/10/17, p. 5). This court considered the corrected pre-sentence report and weighed the information contained therein.

Pennsylvania has a guided sentencing system that requires a judge to consider the guidelines promulgated by the Pennsylvania Commission of Sentencing in ordering a minimum sentence. Commonwealth v. Yuhasz, 923 A.2d 1111, 1118 (Pa. 2007), citing 42 Pa.C.S. § 9721(b). "The Sentencing Guidelines, located at 204 Pa.Code § 303 et seq., recommend ranges of minimum sentences based on the type of offense,

the defendant's prior criminal history, and a variety of aggravating and mitigating factors. The standard recommended minimum sentence is determined by the intersection of the defendant's prior record score and the offense gravity score on the Basic Sentencing Matrix. 204 Pa.Code § 303.16. The Guidelines further recommend that if the court determines that aggravating or mitigating circumstances are present, it may impose a sentence that is a specified amount of time greater than the upper limit of the standard range or less than the lower limit of the standard range. 204 Pa.Code § 303.13." Id. In addition, pursuant to 42 Pa.C.S.A. § 9756 (b), "[t]he court shall impose a minimum sentence of confinement which shall not exceed one-half of the Maximum sentence imposed."

Defendant's allegation that her sentence is excessive is without merit. As discussed above, Defendant pled guilty to twelve total counts of various crimes against her own infant daughter: two counts of aggravated indecent assault; indecent assault of a child less than 13 years old; two counts of sexual abuse of children; endangering welfare of children; and six counts of conspiracy. All of these counts are felonies under Pennsylvania law.

Aggravated indecent assault is a felony of the first degree, pursuant to 18 Pa.C.S.A. § 3125(c)(2). Where there is a course of conduct of indecent assault of a child less than 13 years old, the offense constitutes a felony of the third degree pursuant to 18 Pa.C.S.A. § 3126(b)(3)(ii). Defendant pled guilty to engaging in said course of conduct and this was acknowledged by the parties at sentencing. (See Guilty Plea Colloquy Form and N.T., 5/10/17, p. 8). Sexual abuse of children, dissemination of child pornography, is a felony of the third degree pursuant to 18 Pa.C.S.A. § 6312(d.1)(2). Sexual abuse of

10

children, production of child pornography, is a felony of the second degree pursuant to 18 Pa.C.S.A. § 6312(d.1)(1). Endangering the welfare of a child where there is a course of conduct of violating a duty of care constitutes a felony of the third degree pursuant to 18 Pa.C.S.A. § 4304(b). Defendant pled guilty to engaging in said course of conduct and this was acknowledged by the parties at sentencing. (*See* Guilty Plea Colloquy Form and N.T., 5/10/17, p. 8).

Conspiracy to commit aggravated indecent assault is a felony of the first degree, pursuant to 18 Pa.C.S.A. § 905 and § 3125(c)(2). Conspiracy to commit indecent assault of a child less than 13 years old within a course of conduct constitutes a felony of the third degree pursuant to 18 Pa.C.S.A. § 905 and § 3126(b)(3)(ii). Conspiracy to commit Sexual abuse of children, dissemination of child pornography, is a felony of the third degree pursuant to 18 Pa.C.S.A. § 905 and § 6312(d.1)(2). Conspiracy to commit Sexual abuse of children, production of child pornography, is a felony of the second degree pursuant to 18 Pa.C.S.A. § 905 and § 6312(d.1)(1). Conspiracy to commit endangering the welfare of a child where there is a course of conduct of violating a duty of care constitutes a felony of the third degree pursuant to 18 Pa.C.S.A. § 905 and § 4304(b).

Pursuant to Pa.C.S.A. § 1103, "a person who has been convicted of a felony may be sentenced to imprisonment as follows: (1) In the case of a felony of the first degree, for a term which shall be fixed by the court at not more than 20 years. (2) In the case of a felony of the second degree, for a term which shall be fixed by the court at not more than ten years. (3) In the case of a felony of the third degree, for a term which shall be fixed by the court at not more than seven years."

Guideline sentence recommendations are based on the Offense Gravity Score

11

and Prior Record Score. Defendant has no prior record score. Pursuant to the Sentencing Guidelines, aggravated indecent assault of a child has an offense gravity score of 12 and a standard range sentence of 48 to 66 months, plus or minus 12. Indecent assault of a child less than 13 years old has an offense gravity score of 6 and a standard range sentence of 3 to 12 months, plus or minus 6. Sexual abuse of children, dissemination of child pornography, has an offense gravity score of 7 and a standard range sentence of 6 to 14 months, plus or minus 6. Sexual abuse of children, production of child pornography, has an offense gravity score of 9 and a standard range sentence of 12 to 24 months, plus or minus 12. Endangering the welfare of children with a course of conduct of violating a duty of care has an offense gravity score of 6 and a standard range sentence of 3 to 12 months, plus or minus 6.

Criminal Conspiracy to commit aggravated indecent assault of a child has an offense gravity score of 11 and a standard range sentence of 36 to 54 months, plus or minus 12. Criminal Conspiracy to commit indecent assault of a child less than 13 years old has an offense gravity score of 6 and a standard range sentence of 3 to 12 months, plus or minus 6. Criminal Conspiracy to commit sexual abuse of children, dissemination of child pornography, has an offense gravity score of 7 and a standard range sentence of 6 to 14 months, plus or minus 6. Criminal Conspiracy to commit sexual abuse of children, production of child pornography, has an offense gravity score of 9 and a standard range sentence of 12 to 24 months, plus or minus 12. Criminal Conspiracy to commit endangering the welfare of children with a course of conduct of violating a duty of care has an offense gravity score of 6 and a standard range sentence of 3 to 12 months, plus or minus 6.

12

All of the incarceration periods imposed are in the standard Sentencing Guidelines range, except the incarceration period for conspiracy to commit aggravated indecent assault which is in the aggravated range. On count 1, aggravated indecent assault of a child, Defendant received a minimum sentence of 5 years, which is within the standard sentencing guidelines range of 4 to 5.5 years. On Count 2, aggravated indecent assault of a child, Defendant received a minimum sentence of 5 years, which is within the standard sentencing guidelines range of 4 to 5.5 years. On Count 5, indecent assault of a child less than 13 years of age, Defendant received a minimum sentence of 1 year, which is within the standard sentencing guidelines range of 3 to 12 months. On Count 7, sexual abuse of children dissemination of child pornography, Defendant received a minimum sentence of 1 year, which is within the standard sentencing guidelines range of 6 to 14 months. On Count 13, sexual abuse of children production of child pornography, Defendant received a minimum sentence of 1 year, which is within the standard sentencing guidelines range of 1 to 2 years. On Count 17, endangering the welfare of children, Defendant received a minimum sentence of 1 year, which is within the standard sentencing guidelines range of 3 to 12 months.

On count 18, conspiracy to commit aggravated indecent assault of a child, Defendant received a minimum sentence of 5 years, which is within the aggravated sentencing guidelines range of 3 to 4.5 years, plus or minus 12 months. On Count 19, conspiracy to commit aggravated indecent assault of a child, Defendant received a minimum sentence of 5 years, which is within the aggravated sentencing guidelines range of 3 to 4.5 years, plus or minus 12 months. On Count 20, conspiracy to commit indecent assault of a child less than 13 years of age, Defendant received a minimum

13

sentence of 1 year, which is within the standard sentencing guidelines range of 3 to 12 months. On Count 21, conspiracy to commit sexual abuse of children dissemination of child pornography, Defendant received a minimum sentence of 1 year, which is within the standard sentencing guidelines range of 6 to 14 months. On Count 22, conspiracy to commit sexual abuse of children production of child pornography, Defendant received a minimum sentence of 1 year, which is within the standard sentencing guidelines range of 1 to 2 years. On Count 23, conspiracy to commit endangering the welfare of children, Defendant received a minimum sentence of 1 year, which is within the standard sentencing guidelines range of 3 to 12 months.

Balancing all the sentencing factors, the imposition of incarceration for 18 to 36 years was a reasonable, fair sentence for the crimes Defendant committed. On these twelve counts, Defendant was facing a statutory maximum sentence of 135 years if the sentences were to be served consecutively.

In this case, five of the six conspiracy counts were ordered to be served concurrent to the first conspiracy count and the endangering the welfare of children count was ordered to be served concurrent with the sexual abuse of children, production of child pornography, count.

"A court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question." Commonwealth v. Caldwell, 117 A.3d 763, 769 (Pa.Super. 2015), citing Commonwealth v. Mastromarino, 2 A.3d 581, 587 (Pa.Super. 2010), appeal denied, 609 Pa. 685, 14 A.3d 825 (2011). "Rather, the imposition of consecutive rather than concurrent sentences will present a substantial question in only 'the most extreme circumstances, such as where the

14

aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment.'" Caldwell, 117 A.3d at 769, quoting Commonwealth v. Lamonda, 52 A.3d 365, 372 (Pa.Super. 2012), appeal denied, 621 Pa. 677, 75 A.3d 1281 (2013).

In conclusion, Defendant must now be accountable for the numerous sexual assaults and sexual abuse she committed on her young daughter. This court adamantly denies Defendant's allegation that it showed partiality, prejudice, bias or ill-will against Defendant when imposing the sentence. This court thoroughly considered all sentencing factors when formulating the sentence, including the pre-sentence investigation report, the sentencing memoranda submitted by the parties, arguments of counsel and Defendant's statement at sentencing, Defendant's cooperation with the authorities during the investigation and her testimony at her co-defendant's trial. All sentencing factors were weighed and this court sentenced Defendant fairly for the crimes she committed. The allegation on appeal that Defendant's sentence is excessive is without merit.

Defendant's allegation that the court failed to consider her allegation of extreme circumstances of abuse, duress and coercion by co-defendant is also without merit. In her post sentence motion, Defendant argues that she "was under duress by her abusive ex-spouse – Alejandro Sanchez-Torres – who continuously threatened her life and well-being via mental and physical assault, forcing her to participate and allow the offenses in question." She further argued that "[i]f and when ...[she] refused to comply with her ex-spouse's orders to participate and allow the offenses in question he would viciously assault her and then threaten to continue assaulting her unless she complied with his orders."

It must first be noted that at the time Defendant's Motion to Reconsider

15

Disposition and Sentence was filed, on May 19, 2017, Defendant's new counsel, Ben Datika, Esquire, appeared to be quite unfamiliar with the facts to which the Defendant pled guilty or the facts to which Defendant testified at co-defendant Sanchez-Torres' trial. He also appeared to be unfamiliar with those facts at time of argument on the post sentence motion. At the time of this writing, October 31, 2017, the court has had the transcript of Defendant's testimony at the trial of her paramour, Alexandro Sanchez-Torres, for one week, having received it immediately upon completion. Therefore, Defense counsel did not have access to Defendant's testimony at the time of the post-sentence motion filing or hearing.

Some glaring errors included the fact that Defense counsel repeatedly referred to co-defendant Sanchez-Torres as Defendant's ex-spouse. To the contrary, Defendant and the co-defendant were never married. Co-defendant Sanchez-Torres was married to another woman with whom he lived during the time frame that the crimes took place. He and his wife had children together. Defendant counsel also stated at the post sentence motion hearing that the victim was Defendant and co-defendant's child. However, while the child was Defendant's child, she was not the co-defendant's child. (See N.T., 6/20/17, pgs. 14-15).

Defense counsel's argument that this court was unaware at the time of sentencing that Defendant argued that she was abused by the co-defendant is not supported by the record. The pre-sentence investigative report stated that Defendant "described that she was put under extreme emotional, physical and sexual abuse by the co-defendant during the time the abuse of her daughter was carried out." This court noted her remarks at sentencing. (N.T., 5/10/17, p. 4). Also at sentencing, prior

16

defense counsel addressed a level of abuse and manipulation between Defendant and co-defendant and noted that in addition to that abuse, that Defendant was in a prior abusive relationship when she was 15 or 16 years old. (N.T., 5/10/17, pgs. 9-10). The court was aware of these allegations made by Defendant.

Defendant's allegations in the post sentence motion and at the post sentence motion hearing are found to be not credible in light of the evidence. Defendant alleged that she suffered emotional and physical abuse by the co-defendant and that he made her commit the sexual assaults on the victim. Defendant alleged that if she refused to assault the child, co-defendant would brutally abuse her and violently choke her until she could not breathe. He would punch, slap and rape her. She alleged that it was a continuous cycle of her refusing and him continuously assaulting her at each episode. She also alleged that co-defendant threatened that if she did not do what he said, he would kill her and then do whatever he wanted to do with the daughter. (N.T., 6/20/17, pgs. 8-15).

The picture painted at the post-sentence motion hearing is very different than the testimony given by Defendant at her co-defendant's trial and is not credible in light of all the evidence that was set forth concerning the sexual abuse the two defendants inflicted on the child victim.

Evidence was presented at co-defendant Alejandro Sanchez-Torres' trial that Defendant and co-defendant communicated via Facebook messenger and exchanged pictures that displayed the vaginal and anal areas of the infant victim. The Facebook messenger exchange between them, admitted as an exhibit in co-defendant's trial, was a conversation from October 6, 2015 through October 13, 2015. Below is only the

17

conversation that took place between them on October 12, 2015, which was read into the record, and clearly establishes that Defendant was greatly anticipating Defendant's arrival at her home and establishes that she was a full participant in the sexual assaults of the victim:

MS. KING: I am going to ask Detective Rosado and Miss Ryan, for you to read that portion previously mentioned of those Facebook message conversations.

If you would, Detective Rosado, if you could read the lines belonging to the defendant.

THE WITNESS: Okay.

MS. KING: Miss Ryan, if you could read those portions that belong to Carolina Lemus Almanza.

MS. RYAN: Yes.

MS. KING: Thank you.

THE COURT: And, again, Detective Rosado is starting on Page 56, Line 27.

THE WITNESS: Okay.

MS. RYAN: Two image sent.

"Look at your little monkey. She's sending you kisses. She's sad. She's is waiting for you. Call me. I love you."

THE WITNESS: "I want to see you both."

MS. RYAN: "Okay. Wait.

Okay. Let me take them. Hold on.

Are you done, love?

Come on."

THE WITNESS: "What are you doing, mommy?"

MS. RYAN: "I'm here feeding soup to the little monkey so I can put her to sleep and do what you told me, daddy.

You know, it's throbbing, and it wants it all."

THE WITNESS: "I know, love. I also have a boner."

MS. RYAN: "For real? Take a picture.

Love, I miss you a fuckload.

Message deleted.

To see which one of all of them you like.

Message deleted.

Message deleted."

THE WITNESS: "Did you finish?

Love?"

MS. RYAN: "Yes, love, but I don't like it like that."

THE WITNESS: "Wait until it gets more wet."

MS. RYAN: "I like more when you make me finish, and I like to finish in you."

18

THE WITNESS: "Message deleted."

MS. RYAN: "Message deleted." Three picture files.

Ah, daddy, how I want to feel it all inside, love."

THE WITNESS: "That's how I like it, to get very wet.

Make it lubricate more."

MS. RYAN: "Yes love. I also like getting wet and wet you, daddy.

The little monkey woke up. She was awaken by the bitching cough.

I am going to try again. I have her here hugging her so she stays asleep, daddy.

The girl is screaming for you.

Love, are you really going to stop by tomorrow morning?

I want you to put it inside of me.

With nothing outside.

Did you get mad?

What are you doing that you are not answering me, love?"

THE WITNESS: "Did she wake up? Mmmm. I want you to get more wet, baby."

MS. RYAN: "Yes, love. She is not going to sleep. The bitch cough woke her up.

Come here with me, love, to do it all night, daddy.

Love, I didn't like it that like."

THE WITNESS: "Mmmm, you know I want to see you both naked."

MS. RYAN: "I like it more when you do me, and that you hit me on your big ass cheeks?"

THE WITNESS: "I know. I will do it to you later.

I know, baby."

MS. RYAN: "Okay, love. But now we need for the little monkey to let us. Right now she doesn't even let me touch her to take her diaper off.

I would get the baby naked for you when you stop by tomorrow.

I will leave her just in a diaper and I will wait with nothing, my love."

THE WITNESS: "The two of you naked."

MS. RYAN: "Top and bottom.

Or the two at the same time.

Okay my love. That is how you are going to find the two of us, daddy.

I love you a lot and you – "

THE WITNESS: "With nothing?"

MS. RYAN: "Yes."

THE WITNESS: "I love you, too."

MS. RYAN: "With nothing, daddy."

19

THE WITNESS: "Really."

MS. RYAN: "Tomorrow I am going to get you more wet than what I got today.

Unintelligible. Possible. I didn't feel it good."

THE WITNESS: "Really, my love, with nothing?

Okay, baby, but I want you to squeeze it very hard.

With your pussy."

MS. RYAN: "I am going to make it syrup of pancake. And I am going suck it. And I am going to put it on my tits.

As well.

Ahh, daddy, that is how I am going to do it. That is why I am going to wait until tomorrow. I am going to squeeze all, all.

Until it hurts you, my love.

We're going to do it on the bed, on the sofa, even on the floor.

Love.

What are you doing? Did you jerk off?"

THE WITNESS: "Okay, love. That's how I like you to be, very hot with me."

MS. RYAN: "I am always going to be love."

THE WITNESS: "I want to see my big asses love."

MS. RYAN: "Only for you. Everything is yours.

Okay, love.

Tomorrow you will look at them because the little monkey does not want me to look there.

She is mad. Tomorrow you look at us, love.

Did you eat, daddy?

Did you shower?

Love, do you know what I want?"

THE WITNESS: "Message deleted. Picture file."

MS. RYAN: "Ahh, daddy."

THE WITNESS: "He wants you on your fours."

MS. RYAN: "Yes, love, yes, I am going to suck it a good time..

And I want him inside, just like he is asking.

Daddy, do you know what I want?

I want us to see each other like before, to do it in the shower, and I want to go out like before, my love, I love you.

Daddy, my girl birthday is coming up next Tuesday.

And I want you to be with me, please.

I love you a lot. Answer me."

THE WITNESS: "Okay, baby. And what gift do you want, love?"

MS. RYAN: "Whatever you want to give me.

I want to go eat that you be with me if you cannot give me the cellular phone that I told you.

20

I will exchange it with you for Christmas.

I want to go eat and you to be with me and if you can take me to buy clothes for little monkey and me.

What are you doing that you are not answering?"

THE WITNESS: "yes. I will give you something, love."

MS. RYAN: "Okay, love, whatever you want.

I love you."

THE WITNESS: "And I love you."

MS. RYAN: "Do you think you can take me where I told you?

Go eat, to be with me, please?

How?

My love, are you really coming in the morning?

Really?"

THE WITNESS: "I'm going to try, my love.

Yes, yes, I'm going to go, love."

MS. RYAN: "Really. Please."

THE WITNESS: "Yes."

MS. RYAN: Really, swear it because I want that lollipop, love.

And is really good, even if you say it's little, but for me it's perfect, is really good, my love."

THE WITNESS: "I promise I am going to go, but I want both of you naked."

MS. RYAN: "I love you.

Okay, my love, that is how it's going to be. How you say, daddy."

Three pictures of the co-defendant.

"For you to think of me like I think of you at all time of the day and night.

Sent a Facebook sticker."

THE WITNESS: "I always do. I want to kiss it to the two of you."

MS. RYAN: "I love you sticker sent.

So do I, my love?

Did you receive the stickers that I sent you?"

THE WITNESS: "Yes."

MS. RYAN: "Sticker of drunken dog next to a bottle.

This is how I want to get with you, love.

Hello, what you are doing, daddy?

Hello."

THE WITNESS: "Yes, love. That is how we're going to get. Baby."

MS. RYAN: "Love, when are we going to be together like before when we drink a beer and watched movies.

Really?

21

You know, I want us to be like that. I want to do the same as before, daddy."

THE WITNESS: "Okay, my love."

MS. RYAN: "Okay, love. Are we really going to go out like before?

THE WITNESS: "you know, mommy, I want to find the two of you naked in the morning. I am going to kiss the little tails of both of you."

MS. RYAN: "Okay, love. It's fine, daddy. That's how it's going to be.

However you say."

THE WITNESS: "Are you going to let me suck both of you, love?"

MS. RYAN: "This is how we're going to be waiting. Yes, love."

THE WITNESS: "Really, baby?"

MS. RYAN: "We need the little monkey to allow it. Yes, really."

THE WITNESS: "If she is asleep, we'll wake her up, or if she is asleep, we won't wake her up."

MS. RYAN: "Daddy, I feel bad. I feel sad and depressed for everything that is happening to us, and have happened.

Okay, love, it's fine."

THE WITNESS: "Forget that."

MS. RYAN: "Yes, love, it's fine. I would try not to think anything, but you know one thing, I am alone like a fucking dog.

Because not even with my own fucking people I can count on again. Mima started with her shit, but I won't pay attention. And I sent her away.

Because it doesn't help and starts fucking.

At the end, we have to forget all of that and be happy all three, again, love, or not.

I love you. I love you.

Love, did you look at the sky? It's very cloudy, like if it is going to know.

Love, I am going to bathe, love. Do you want to come and bathe with me?

Message deleted. Three pictures files sent. Possible victim's nude pictures.

Look, love, she let me do it. She saw I was going to bathe and she also want bathe. Daddy, I love you."

THE WITNESS: "How beautiful, baby."

MS. RYAN: "They are all for you love.

You know what, when I undressed her, she tricked me.

She didn't want to bathe, love.

Baby, where are you that you don't answer me?"

22

THE WITNESS: "Clean it very clean."

MS. RYAN: "Okay, love, I will do it."

THE WITNESS: "Okay, love."

MS. RYAN: "Because did not want to shower. She said she doesn't want to. I think she has chills because she is lying down wrapped.

Where are you?

Why don't you answer? Where you are, love?

Are you okay?

Love, I left the car in the parking lot I told you about up the street. But it's here where I always park but it is in the upper side. I just want to let you know.

I just want to let you know so when you come, if you don't see the car, don't think that I am not here. I left it there. I didn't want to go to move it, daddy. I love you, come tomorrow, please. Love you.

What are you doing that you don't answer? You are with the fox; right?"

THE WITNESS: "Okay, my love. I will go tomorrow because I am going to kiss the little tails of both of you.

Pretty good."

MS. RYAN: "Okay, love. It's fine. We will wait here for you. Like you told me.

Did you eat love?

What are you doing?"

THE WITNESS: "But I want both of you very naked."

MS. RYAN: "Okay, love. We're going to wait for you like that, daddy."

THE WITNESS: "When I get there, open the little legs to go in under the blanket, okay?"

MS. RYAN: "And what are you doing, love? Did you fall asleep, or what were you doing?"

THE WITNESS: "And do not get without a blanket."

MS. RYAN: "Okay, love. Ahh, how good. Okay, daddy."

THE WITNESS: "So the little monkey doesn't wake up."

MS. RYAN: "What are you doing?"

THE WITNESS: "I am going to sleep so I am not too sleepy."

MS. RYAN: "Okay, love. We will do it like that. Daddy, what should I give the girl to drink?"

THE WITNESS: "And you as well, okay."

MS. RYAN: "Okay, love. We are already laying down.

Dream about us, love. We will be here waiting, but come, please, please.

Sent thumbs up sticker.

23

She doesn't want to drink water. I am giving her pure Gatorade, love?"

THE WITNESS: "Go to sleep.

So I'll be there soon.

My love."

MS. RYAN: "Okay, my love. Love you.

Until tomorrow, we will be here waiting, love you."

THE WITNESS: "Me, too. Don't text with anyone. Okay."

MS. RYAN: No, love, I don't text with anyone, just you, I swear, love."

THE WITNESS: "Do you want to do crazy things with the little money or not?"

MS. RYAN: "No, not with the little monkey because she gets mad if we wake her up.

But if it is possible, it is fine, love."

THE WITNESS: "You don't want to."

MS. RYAN: "Yes."

THE WITNESS: "Really?"

MS. RYAN: "Yes, I want to.

Love.

It's just she gets mad when I wake her up.

But if it's what you want, we'll do it. Whatever you say, daddy.

Love you."

THE WITNESS: "Really, love?"

MS. RYAN: "Yes, love, really. We will do however you want, daddy."

THE WITNESS: "We will do things to her while she sleeps.

Love.  .

Yes."

MS. RYAN: "Okay.

Love, whatever you want, daddy.

If you want, yes.

Love you."

THE WITNESS: "Tell me, baby, what you want us to do. Give me your ideas, baby.

Tell me, love."

MS. RYAN: I don't know, love. I will say a little bit of everything."

THE WITNESS: "Go ahead, baby, tell me."

MS. RYAN: "Less putting the finger inside because it can hurt her later."

THE WITNESS: "Slowly."

MS. RYAN: "Just kiss her tits and cauliflower.

How about if she cries or it hurt her, love?"

THE WITNESS: "We will try."

24

MS. RYAN: "Oh, well. We can try, daddy.
But if we see that it hurts her, no. Okay, love."
THE WITNESS: "Okay, love."
MS. RYAN: "I want it a lot, daddy.
Are you laying down?"
THE WITNESS: "Me, too.
Yes."
MS. RYAN: "Did you hide the keys from the pig?
How much?
Love, I love you. And I want you here with me.
And what are you doing? You never answer me."
THE WITNESS: "Look, you can pass my thing by her little
ass, love.
Or not."
MS. RYAN: "What? What?
What? What, love?"
MS. RYAN: "Do you want me to rub it or what?
Oh, love."
THE WITNESS: "If you want, love.
You give the orders."
MS. RYAN: "I don't know. I am going to think about it."
THE WITNESS: "Tell me, love."
MS. RYAN: "No, love. Not like that, just me, not her, daddy.
Please, daddy, just me.
But if it can happen, yes."
THE WITNESS: "But we won't hurt her."
MS. RYAN: "Okay."
THE WITNESS: "Baby, just to make things very hot, baby.
We will do it.
Love."
MS. RYAN: "Okay, love is fine."
THE WITNESS: "Really?"
MS. RYAN: "But without hurting her, yes."
THE WITNESS: "Okay, my love, you grab my, okay."
MS. RYAN: "Okay, daddy."
THE WITNESS: "And you move it.
Okay, my love?"
MS. RYAN: "Okay, love."
THE WITNESS: "Tell me what else, baby."
MS. RYAN: "We will do it like that, daddy."
THE WITNESS: "Give me your ideas."
MS. RYAN: "We will see what else we do."
THE WITNESS: "Okay, love."
MS. RYAN: "I have some that I am going to do with you."
THE WITNESS: "How would you like it, love?"

25

MS. RYAN: "Love, I don't know what else with the little monkey, ha ha. Just like you said, daddy."

THE WITNESS: "You tell me a few ideas, love."

MS. RYAN: "I am going to put something in my penis and you and going to like it.

I don't know what else."

THE WITNESS: "Mmmmm, you don't want it, baby?"

MS. RYAN: "Will see at the time what else we can do. Yes, love, I want to."

THE WITNESS: "Really?"

MS. RYAN: "But I DON'T KNOW. We are going to put honey in."

THE WITNESS: "In where?"

MS. RYAN: "On her little tits, and we are going to suck them, the two of us."

THE WITNESS: "Okay, love."

MS. RYAN: "On all your body and mine."

THE WITNESS: "Okay, baby. Look, I am going to sleep, baby. Love you.

I will see you in the morning."

MS. RYAN: "And to the little monkey, only on her little tits, and we are going to pass your little thing over there, but without hurting her.

Okay, baby. I am also going to sleep.

I love you. I will be waiting here."

THE WITNESS: "Okay, baby. I will see you in the morning, then."

MS. RYAN: "Really, love. Come, please."

THE WITNESS: "Okay."

MS. RYAN: "Okay, love. Love you."

THE WITNESS: "Okay, love. I'll go.

I see you later.

Okay."

MS. RYAN: "Okay, love. I will be waiting, love you. Okay."

THE WITNESS: "But both naked, don't do me wrong."

MS. RYAN: "Okay, love."

THE WITNESS: "Okay."

MS. RYAN: "I am going to leave the little monkey just with her diaper, because, if not, she will pee, okay?

And me without anything, love. Love you."

THE WITNESS: "Okay. It's fine.

Look, don't put her to sleep too sooon so she doesn't wake up.

What are you doing?

Mommy.

26

What are you doing?

Answer me, big cheeks.

Stop talking, okay?

What are you doing?

I am going over there now.

Right now.

MS. RYAN: "Okay, my love."

THE WITNESS: "Why you didn't answer."

MS. RYAN: "I was cleaning dishes because I ate.

And the phone was charging.

Come now.

What happened? Are you okay?"

THE WITNESS: "Look, don't put the little monkey to sleep soon.

So she doesn't wake up.

Okay?"

MS. RYAN: "Is that the man that lives above me called me.

To tell me that he is doing everything possible to get me the job, love."

THE WITNESS: "Hold your needs for me, baby.

Okay, baby?"

MS. RYAN: "Okay, love. Come.

Everything okay?

He hung up.

He just call me to tell me and I was washing dishes.

But I finished."

THE WITNESS: "I will go around 3:30."

MS. RYAN: "Where are you?

Okay, love.

What happened? Are you fine?"

THE WITNESS: "yes, love. I am going to sleep."

MS. RYAN: "Don't scare me. What's wrong?

Okay, love.

Are you really fine? Don't lie to me?"

THE WITNESS: "Look, don't put the little monkey to sleep soon so when I go she doesn't wake up, love."

MS RYAN: "Love, I love you. I am here waiting. Love.

Love you.

Okay, love.

I am going to bathe her now."

THE WITNESS: "Okay. I see you later. Give it to her."

MS. RYAN: "Because I don't like her to go to sleep dirty."

THE WITNESS: "To kiss her delicious thing."

MS. RYAN: "She is full of grease because I cooked her potatoes.

Okay, love. Here, we will be.

27

Waiting daddy. Love you."
THE WITNESS: "Okay. I am going to sleep, love you, baby. Bye."
MS. RYAN: "Okay, love, the same."
MS. KING: Thank you.
BY MS. KING:
Q        Detective Rosado, what does the term little monkey mean?
A        It's a term of endearment, means little girl.
Q        What about little tail?
A        Colita, in this conversation, they reference vagina or little girl.

(N.T., Sanchez-Torres Trial 1/11/17, pgs. 21-42).

A review of this one out of numerous message conversations between Defendant and co-defendant leaves no doubt that Defendant desired co-defendant's attentions and was offering up her baby as a sexual toy and incentive to entice co-defendant to come to her home to engage in sexual relations. These are not the words of an abused woman who was sexually assaulting her daughter out of fear that co-defendant would harm or kill her. Defendant's tone was that of a desperate woman who was practically begging Defendant to come to her home to commit these vile acts.

In addition to the above, Defendant testified at co-defendant's trial regarding the acts she committed. She testified that she sexually assaulted her daughter by touching, rubbing and kissing her on her vagina, rear end and chest. (N.T., Sanchez-Torres Trial 1/11/17, pgs. 47-48 and 53). Defendant admitted that she touched the victim's vagina, anus and breasts with her mouth. (N.T., Sanchez-Torres Trial 1/11/17, p. 79). She admitted that she and the co-defendant agreed to touch her daughter's intimate parts for their sexual arousal. (N.T., Sanchez-Torres Trial 1/11/17, p. 80).

She stated that she took sexually explicit pictures of her daughter's vaginal area and rear end and shared them with her co-defendant through Facebook messenger.

(N.T., Sanchez-Torres Trial 1/11/17, pgs. 48, 59-60 and 80). Defendant testified that the messages she sent to Defendant were sexual in nature and included things she wanted to do sexually with Defendant and also her daughter. (N.T., Sanchez-Torres Trial 1/11/17, p. 60).

When asked to describe how her daughter was involved when she and co-defendant were having sex, Defendant testified that she would take her daughter's clothes off and she would sometimes be lying next to them, or she would put the child on top of Defendant's stomach so co-defendant could look at her when he was penetrating Defendant's rear end. (N.T., Sanchez-Torres Trial 1/11/17, p. 51). Defendant was asked, "[w]hen this was happening, did you ever orgasm?" and she responded, "[y]es." Id. Defendant further testified that touching her daughter excited Defendant sexually. (N.T., Sanchez-Torres Trial 1/11/17, p. 54). When Defendant and co-defendant were having sex, Defendant would sometimes touch the victim's vagina. (N.T., Sanchez-Torres Trial 1/11/17, p. 67).

Defendant lived at two locations during that time these acts took place, Rita Flores' house in which she had her own room and then her own apartment which she shared only with her baby, the victim. (N.T., Sanchez-Torres Trial 1/11/17, pgs. 61-63). Defendant testified that the reason co-defendant would visit her was to have sex and that he would stay for only 20-30 minutes each time. (N.T., Sanchez-Torres Trial 1/11/17, pgs. 61, 63-64 and 76). Defendant testified that co-defendant Sanchez-Torres visited her and the victim almost daily for these sexual encounters. (N.T., Sanchez-Torres Trial 1/11/17, pgs. 63 and 76). These sexual assaults started on the victim when she was between six months and one year old and continued until they were

29

arrested in October 2015. (N.T., 6/2/16, pgs. 4-6 and N.T., Sanchez-Torres Trial 1/11/17, pgs. 64-66 and 76).

The sources of the evidence are: directly from Defendant's testimony, the message conversation between Defendant and co-defendant, and the facts to which Defendant pled guilty. Co-defendant's trial lasted four days and included seven witnesses and 40 Commonwealth exhibits that established the totality of the circumstances surrounding the sexual abuse of the young victim. We need only look to Defendant's testimony, the one message conversation between Defendant and co-defendant and the facts to which she pled guilty, in order to refute Defendant's claim that she did these acts because she was abused by co-defendant. This claim is incredible.

. In summary, the evidence revealed that Defendant never reported to the police or anyone else about the abuse occurring to her infant daughter in her presence or at her hand. Nor did Defendant report to the police or anyone else that she was being forced to commit acts with her daughter for fear of "her life and well-being via mental and physical assault." (Defendant's Motion to Reconsider Disposition and Sentence, filed May 19, 2017). She also did not tell anyone that if she "refused to comply with [Sanchez-Torres'] orders to participate and allow the offenses in question, he would viciously assault her and then threaten to continue assaulting her unless she complied with his orders." Id. There was no evidence that she was "under the continuous duress to participate in the offenses by way of extreme assault and threats of assault." Id.

The first and only remark she made about any abuse by co-defendant was in her interview with the Chester County Probation Department after she entered her guilty

plea, for the purposes of her Pre-Sentence Investigation. The PSI writer wrote, "She further described that she was put under extreme emotional, physical and sexual abuse by the co-defendant during the time the abuse of her daughter was carried out." This court noted her remarks at sentencing. (N.T., 5/10/17, p. 4).

The court is required to consider the Defendant and sentence according to the gravity of the offense, the impact on the victim and the community and the rehabilitative needs of the defendant. The court adhered to all sentencing requirements in sentencing Defendant to 18 to 36 years in prison for the crimes charged. All of these requirements were meticulously considered.

Defendant was given credit toward mitigation by the fact that she cooperated with the police and the District Attorney. She offered testimony against her co-defendant about what they both did in the events to support the charges. Defendant was also given credit for accepting responsibility by pleading open to the charges, without promises being made about her sentence. The court also noted that there is hope that the child will have no memory of the assaults due to her young age. Accordingly, Defendant's allegation that this court failed to adequately consider the mitigating circumstances in sentencing is without merit and should be dismissed.

Defendant claims this court exercised its judgment for reasons of partiality, prejudice, bias or ill will against Defendant and revealed its particular disgust of the offenses. The record reflecting the acts committed by Defendant and her co-defendant against Defendant's six month old baby, which continued until the child was two years old, shocked the conscience of the listener because of the utter helplessness of the victim and the length of time the assaults continued. The Court's recognition of the

31

gravity of these offenses because of the facts does not equate to prejudice, bias, ill will or disgust by the court, contrary to Defendant's claim. While Defendant's cooperation and admission of guilt were mitigating factors on the sentence imposed, they did not erase the gravity of the offense.

Defendant's final issue on appeal is that the court erred by treating her as a sexually violent predator for sentencing purposes, despite the fact that she was not allowed to undergo a sexually violent predator interview and analysis is also without merit. First, Defendant was given an opportunity to be interviewed by the SOAB, but she declined to participate. Defendant's request in the post sentence motion to re-do the assessment, with Defendant's now participation, is not supported by the law. Defendant waived her participation.

Second, this court notes that the sentence analysis set forth above, which is supported by the evidence and the law, was only infinitesimally influenced by the fact that she was found to be a sexually violent predator, if it had any influence at all. The evidence, statutes, Sentencing Guidelines and case law, regarding how to fairly formulate a sentence structure, was the sound basis for Defendant's sentence.

Third, this court must note that pursuant to the recent case of <u>Commonwealth v. Butler</u>, the Pennsylvania Superior Court has held "that section 9799.24(e)(3) of SORNA violates the federal and state constitutions because it increases the criminal penalty to which a defendant is exposed without the chosen fact-finder making the necessary factual findings beyond a reasonable doubt. Moreover, we are constrained to hold trial courts cannot designate convicted defendants SVPs (nor may they hold SVP hearings) until our General Assembly enacts a constitutional designation mechanism." 2017 WL

32

4914155, 6, --A.3d--, 2017 PA Super 344 (Pa.Super. 2017).

Even though Defendant was found to be a sexually violent predator prior to the Butler decision on October 31, 2017, this court acknowledges the status of the law and may anticipate a remand from Superior Court to address the designation.

BY THE COURT:

_Phyllis Streitel_
PHYLLIS R. STREITEL,     J.

DATE: _11-13-17_

# EXHIBIT A(2)