COMMONWEALTH of Pennsylvania,
Appellee

v.

Michael MASTROMARINO, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 26, 2010.
Filed July 21, 2010.

A. Charles Peruto, Jr., Philadelphia, for appellant.

Mariana C. Sorensen, Assistant District Attorney, for Commonwealth, appellee.

BEFORE: STEVENS, MUNDY, JJ., and McEWEN, P.J.E.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant Michael Mastromarino's guilty plea to numerous charges[1] in con-

---

1. Mastromarino pled guilty to 1,353 separate counts. *See* Trial Court Opinion filed 5/6/09 at 5; N.T. 8/29/08 at 39. The charges include corrupt organization, 18 Pa.C.S.A. § 911, conspiracy, 18 Pa.C.S.A. § 903, 244 counts of theft by unlawful taking (for the theft of body parts), 18 Pa.C.S.A. § 3921, deceptive business practices, 18 Pa.C.S.A. § 4107, and 16

nection with his participation in the sale of human body parts from 244 corpses. On appeal, Mastromarino presents challenges to the discretionary aspects of his sentence. We affirm.

¶ 2 The relevant factual history has been aptly set forth by the trial court as follows:

In 2002, after unrelated criminal charges resulted in the loss of his dentistry license, [Mastromarino] started a business called Biomedical Tissue Services ("BTS") selling human tissue from cadavers to tissue banks around the country. N.T. 8/29/08 at 23–24. At first, [Mastromarino] worked with funeral home directors in New York and New Jersey who provided access to cadavers from which [Mastromarino] and his team of "cutters" could harvest tissue without the consent of the deceased or their next of kin. N.T. 8/29/08 at 24–25. However, this arrangement required [Mastromarino] and his cutters to reconstruct the cadavers with PVC pipe after harvesting in preparation for burial to conceal the harvesting. N.T. 8/29/08 at 26. Therefore, [Mastromarino] sought an arrangement with a funeral director who had access to a crematory so that the cadavers would not need to be reconstructed and would be destroyed when the harvesting was complete. N.T. 8/29/08 at 26.

In February 2004, [Mastromarino] contacted James McCafferty, who, along with Louis and Gerald Garzone,[2] owned Liberty Crematory in Philadelphia. N.T. 8/29/08 at 26–27. Mr. McCafferty and the Garzones were also funeral directors. N.T. 8/29/08 at 26. The four men agreed that [Mastromarino] would pay the Garzones $1,000 for each cadaver they provided to [Mastromarino's]

cutters. N.T. 8/29/08 at 27–28. One of the Garzones would call [Mastromarino] when there were cadavers available. N.T. 8/29/08 at 28–29. [Mastromarino] would then send a team of cutters, usually led by Lee Crucetta, to Philadelphia to harvest the available cadavers. N.T. 8/29/08 at 29. In some instances, [Mastromarino] would accompany the cutters to Philadelphia. N.T. 8/29/08 at 28.

At the funeral home, the cutters would be directed to cadavers identified by number. N.T. 8/29/09 at 29. In many cases, the deceased had been elderly and sick, sometimes with H.I.V. or hepatitis, and their bodies were harvested outside the recommended time period after death, all in violation of industry standards regarding the harvesting of tissue. N.T. 8/29/08 at 30, 32. Furthermore, the next of kin of the deceased had no knowledge of, and had not consented to, the use of their loved ones in this manner. N.T. 8/29/09 at 24. To create the appearance of compliance, [Mastromarino] falsified the necessary information regarding the identity, condition, and medical history of the deceased, as well as consent forms from next of kin. N.T. 8/29/08 at 25, 30. He also replaced blood samples for tissues from diseased cadavers with mislabeled blood samples from disease-free cadavers to make it appear to the tissue banks that the tissue was disease-free. N.T. 8/29/08 at 30–31. As a result, doctors across the country unknowingly transplanted diseased, mislabeled, or otherwise unsuitable tissue into transplant patients. N.T. 8/29/08 at 33.

In July of 2005, [Mastromarino] learned that he and BTS were under

---

counts of abuse of corpse, 18 Pa.C.S.A. § 5510.

**2.** Louis and Gerald Garzone filed appeals to this Court, which were docketed at 780 EDA 2009 and 695 EDA 2009, respectively.

investigation by authorities in New York and by the FDA. N.T. 8/29/08 at 33. However, he continued to pursue his operation with the Garzones until September of that same year, when he destroyed BTS records and encouraged the Garzones to set fire to their funeral homes. N.T. 8/29/08 at 33. Over the course of the arrangement between the Garzones and BTS, [Mastromarino] harvested at least 244 cadavers provided by the Garzones without the consent of the deceased or their families. N.T. 8/29/08 at 24, 27. The Garzones and Mr. McCafferty received more than $245,000 from [Mastromarino] for their participation in his scheme. N.T. 8/29/08 at 27. [Mastromarino] received more than $1,105,751 from tissue banks who unknowingly purchased this stolen tissue unsuitable for transplantation in order to provide it to doctors for that very purpose. N.T. 8/29/08 at 32.

Trial Court Opinion filed 5/6/09 at 2–3 (footnote added).

¶ 3 The Commonwealth submitted this case to the Grand Jury on May 4, 2006, and after the Grand Jury recommended multiple charges be filed against Mastromarino, he was arrested. On August 29, 2008, Mastromarino, who was represented by counsel, entered an open guilty plea to numerous charges, and on October 22, 2008, Mastromarino proceeded to a sentencing hearing, at the conclusion of which the trial court sentenced him to an aggregate of twenty-five years to fifty-eight years in prison, to run concurrently to the eighteen year to fifty-four year prison sentence Mastromarino was serving in New York.[3] N.T. 10/22/08 at 267. Specifically, Mastromarino was sentenced as follows:

On Count One which charges [a] violation of [the] Corruption Violation Act, I will give you guideline sentence of one to six years in state prison. Any mandatory costs will be added as well.

\*   \*   \*

Count Two charging you with criminal conspiracy, I will sentence you [to] one to six years in state prison. That will run consecutive to the sentence I imposed on Count One.

I'm referring to aggregate counts so you know what I'm referring to.

Aggregate Count Three consists of 244 counts of theft by unlawful taking. I am going to sentence you to a guideline sentence of 6 to 12 months on each of those counts; however, I am going to designate that 32 of those counts run consecutive to each other. That would add 16 to 32 years to your sentence which will run consecutive to the sentences I imposed on the first count.

Count Five charges you with deceptive business practices [which] includes these tissue companies. I will give you [a] guideline sentence of 6 to 12 months for each of those. There [are] four of those, so that would add two to four years to your sentence. They will run consecutive to each other and consecutive with all the other charges that I have sentenced in this case.

Count Nine charges you with abuse of corpse. There are 17 counts remaining. I have dismissed several of them previously. I am going to sentence you in the guideline range, but I am going to give you an aggravated range sentence. The reason for that is so beyond the pale of what the guidelines contemplate for abuse of corpse, that abuse of corpse

---

**3.** Mastromarino was convicted and sentenced in New York in connection with the illegal harvesting of body parts in that State.

for personal enrichment and abusing the corpses in such a manner that puts deceased [*sic*] and mislabeled tissue into s[tream] of commerce for use in transplantation and other kinds of operations. I will sentence you on 15 of those counts consecutively which will add 5 to 10 years to your sentence.

I will permit those sentences, however, to run concurrent with the sentence that you are currently serving in New York City.

So the aggregate sentence that I imposed here—and this is my intention—is 25 to 58 years in state prison to run concurrent with the sentence that is being imposed in New York because I agree with the descriptions of what led to these charges and I don't believe it will be fair to impose these sentences consecutive.

What is the situation as to restitution with regard to Mr. Mastromarino?

N.T. 10/22/08 at 265–267. In that Mastromarino had forfeited $300,000 in cash, the Commonwealth did not seek further restitution.

¶ 4 Mastromarino filed a timely petition for reconsideration of his sentence, which the trial court denied on November 20, 2008. This timely, counseled appeal followed on December 1, 2008, and the trial court ordered Mastromarino to file a Pa.R.A.P. 1925(b) statement. Mastromarino failed to timely comply; however, on March 3, 2009, this Court, in response to a petition filed by Mastromarino, remanded the matter for the filing of a Pa.R.A.P. 1925(b) statement. On March 16, 2009, Mastromarino filed a Pa.R.A.P. 1925(b) statement challenging the discretionary aspects of his sentence, and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

¶ 5 Mastromarino contends his aggregate sentence of twenty-five years to fifty-eight years in prison is manifestly excessive since the trial court abused its discretion in imposing fifty-three consecutive sentences for Mastromarino's convictions. That is, Mastromarino does not challenge the propriety of any specific sentence; but rather, he contends his aggregate sentence is manifestly excessive based on the consecutive nature of the sentences.

¶ 6 Initially, we note that Mastromarino is challenging the discretionary aspects of his sentence. *See Commonwealth v. Gonzalez–Dejusus*, 994 A.2d 595 (Pa.Super.2010) (claim aggregate sentence involving the imposition of consecutive sentences was excessive challenged the discretionary aspects of sentencing). It is well settled that, with regard to the discretionary aspects of sentencing, there is no automatic right to appeal. *See Commonwealth v. Cook*, 941 A.2d 7 (Pa.Super.2007).

This appeal is, therefore, more appropriately considered a petition for allowance of appeal. 42 Pa.C.S.A. § 9781(b). To reach the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine: (1) whether appellant filed a timely notice of appeal, Pa.R.A.P. 902, 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code[.]

*Cook*, 941 A.2d at 11 (citations omitted).

A substantial question will be found where an appellant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the Sentencing Code or is contrary to the fundamental norms which underlie the sentencing process. At a

minimum, the Rule 2119(f) statement must articulate what particular provision of the code is violated, what fundamental norms the sentence violates, and the manner in which it violates that norm. *Commonwealth v. Bullock*, 948 A.2d 818, 826 n. 6 (Pa.Super.2008) (citation omitted). *See Commonwealth v. Feucht*, 955 A.2d 377 (Pa.Super.2008).

¶ 7 Here, Mastromarino filed a timely notice of appeal, and he filed a timely petition for reconsideration of his sentence in which he contended his aggregate sentence was excessive and unreasonable. *See Cook, supra.*

¶ 8 Mastromarino has included in his brief a concise statement of the reasons relied on for allowance of appeal as to the discretionary aspects of his sentence; thus, he has complied with the procedural requirement of Pa.R.A.P. 2119(f). *Commonwealth v. Hornaman*, 920 A.2d 1282, 1284 (Pa.Super.2007). Therefore, we proceed to determine whether Mastromarino has presented a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. *See Cook, supra; Hornaman, supra.*[4]

¶ 9 Recently, this Court examined whether a claim that an appellant's sentence was manifestly excessive based on the imposition of consecutive sentences presents a substantial question. Specifically, in *Gonzalez–Dejusus*, this Court held the following:

Generally speaking, the court's exercise of discretion in imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal. *Commonwealth v. Marts*, 889 A.2d 608 (Pa.Super.2005). However, the case of *Commonwealth v. Dodge ("Dodge I")*, 859 A.2d 771 (Pa.Super.2004) [ (Stevens, J., dissent) ], *vacated and remanded on other grounds*, 594 Pa. 345, 935 A.2d 1290 (2007), finds an aggregate sentence manifestly excessive and that a substantial question was presented where there were numerous standard range sentences ordered to be served consecutively. *Dodge I* offered this holding despite the existence of prior cases finding that an assertion of error grounded upon the imposition of consecutive versus concurrent sentences did not raise a substantial question. Discussing the matter, *Marts* indicates:

To the extent that he complains that his sentence on two of the four robberies were imposed consecutively rather than concurrently, [the appellant] fails to raise a substantial question. Long standing precedent of this Court recognizes that 42 Pa.C.S.A. section 9721 affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same

---

**4.** We note the Commonwealth contends Mastromarino's Rule 2119(f) statement does not present a substantial question since the statement (1) failed to describe what the guidelines were or where Mastromarino's sentence falls in relation to those guidelines and (2) does not specify what fundamental norm was violated or the manner of the violation. *See* Commonwealth's Brief at 9–10. In response, Mastromarino has filed a reply brief, as well as a "Motion for Leave to Conform Brief in Accordance with § 2119(f)" in which he argues his existing Rule 2119(f) statement is sufficient to raise a substantial question. In the alternative, he requests that this Court permit him to amend his Rule 2119(f) statement in order to incorporate "Exhibit A," which he has attached to his Motion. We grant Mastromarino's Motion and specifically note that, in determining whether a substantial question has been presented, we have considered the Motion's "Exhibit A" (which is comprised of a "Procedural History," "Factual History," and "Summary of Argument") as part of Mastromarino's Rule 2119(f) statement.

time or to sentences already imposed. *Commonwealth v. Graham*, 541 Pa. 173, 184, 661 A.2d 1367, 1373 (1995)....Any challenge to the exercise of this discretion ordinarily does not raise a substantial question. *Commonwealth v. Johnson*, 873 A.2d 704, 709 n. 2 (Pa.Super.2005); *see also Commonwealth v. Hoag*, 445 Pa.Super. 455, 665 A.2d 1212, 1214 (Pa.Super.1995) (explaining that a defendant is not entitled to a "volume discount" for his or her crimes).

The recent decisions of a panel of this Court in *Commonwealth v. Dodge*, 859 A.2d 771 (Pa.Super.2004), does not alter our conclusion. In fact, the panel in *Dodge* noted the limitations of its holding. *See id.* at 782 n. 13 (explaining that its decision 'is not to be read a [*sic*] rule that a challenge to the consecutive nature of a standard range sentence always raises a substantial question or constitutes an abuse of discretion. We all are cognizant that sentencing can encompass a wide variation of factual scenarios. Thus, we make clear again that these issues must be examined and determined on a case-by-case basis.'). In *Dodge*, the court imposed consecutive, standard range sentences on all thirty-seven counts of theft-related offenses for an aggregate sentence of 58½ to 124 years of imprisonment. *Marts*, 889 A.2d at 612–613. Thus, in our view, the key to resolving the preliminary substantial question inquiry is whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case.[5]

While in extreme cases, such as those found in *Dodge* (where the appellant received a sentence of 58½ to 124 years' imprisonment after he was convicted of numerous, largely property offenses, *i.e.*, 37 counts of receiving stolen property, two counts of burglary, criminal trespass, etc.), this exercise of discretion can be viewed as raising a substantial question; here the facts simply do not inure to such a finding. [The appellant] took part in what could be described as a "crime spree." It involved first an armed robbery of two individuals at a retail store, and then a kidnapping of a father and infant daughter as well as a car theft. Compounding the prior crimes, [the appellant's] co-conspirator drove in a manner threatening the lives of the kidnap victims. In all, numerous individuals were terrorized during this spree and numerous lives endangered.

Had [the appellant] been involved, on separate days, in a robbery of two individuals, and then a kidnapping of two individuals, and had been sentenced in separate proceedings, the combined sentence of 20 to 40 years' imprisonment for the two criminal episodes would not strike most as a sentence grossly dispa-

---

5. ....We note that *Dodge I* was decided prior to the supreme court's decision in *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957 (2007). Of course, in *Walls*, our supreme court reiterated that the ability of this Court to vacate a sentence is predicated upon a sentence being outside of the guidelines. Given *Walls*, it would appear reasonable to consider whether the *Dodge* approach to reviewing and vacating aggregate sentences that may have been viewed as manifestly exces-sive, although comprised of standard range sentences, had continuing viability. However, *Dodge* was remanded back to this Court for reconsideration in light of *Walls*. Upon reconsideration, the original panel still found the sentence unreasonable and vacated the sentence previously imposed. *Commonwealth v. Dodge ("Dodge II")*, 957 A.2d 1198 (Pa.Super.2008). Thus, as of this date, we view the "excessive aggregate sentence" argument as cognizable upon appellate review.

rate to the appellant's conduct. Nor would it viscerally appear as patently "unreasonable." Thus, in seeking a reduction of his sentence, [the appellant] appears to seek a "volume discount" because the various crimes occurred in one continuous spree. This is simply not a challenge which has the ring of raising a substantial question. *See Commonwealth v. Jones,* 942 A.2d 903 (Pa.Super.2008) (affirming a sentence of 80 to 160 years' imprisonment where the appellant was found guilty of three counts of burglary, two counts of rape, two counts of aggravated indecent assault, two counts of robbery, and one count of simple assault which resulted from three separate home invasions where, in each instance, an elderly woman was robbed and sexually assaulted).

*Gonzalez–Dejusus,* 994 A.2d 595, 599 (footnote in original).

¶ 10 As in *Gonzalez–Dejusus,* the preliminary substantial question inquiry in the case *sub judice* is "whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." *Id.* (footnote omitted). Here, the evidence presented by the Commonwealth revealed that Mastromarino was the "mastermind" behind the illegal harvesting of body parts from 244 corpses in Pennsylvania. In order to effectuate his scheme, Mastromarino (1) started BTS in order to sell human tissue from cadavers to tissue banks around the country, (2) enticed McCafferty and the Garzone Brothers to join the scheme by offering them $1,000 for each cadaver, (3) provided the "cutters," who harvested the tissue from the cadavers, (4) falsified records and mislabeled blood samples to make it appear as if the tissue was removed with consent and from healthy cadavers, and (5) placed diseased or otherwise unsuitable tissue into the stream of commerce, resulting in doctors, who believed the tissue was disease-free and suitable, transplanting the tissue into live patients. Compounding his crimes, upon learning that his "scheme" was under investigation, Mastromarino destroyed records and encouraged the Garzones to destroy their funeral homes in order to hide their crimes. In all, 244 corpses, in Pennsylvania alone, were abused in such a manner that they sat in an alley, unrefrigerated for days, and, after tissue was removed, all that would remain was a head and bloody torso. *See Commonwealth v. Garzone,* 993 A.2d 1245 (Pa.Super.2010) (describing the crimes occurring in the criminal enterprise). Beyond the horrific manner in which the corpses were abused, Mastromarino's crimes left living relatives and friends in "mental anguish," as well as put at risk the health of patients who believed they were receiving healthy, suitable tissue. Moreover, unlike in *Dodge,* in this case, the theft crimes were not "property crimes" in the normal sense; but rather, the charges of theft were for the taking of the body parts from the corpses.

¶ 11 In addition, Mastromarino pled guilty to 1,353 separate counts for his role in the criminal enterprise; however, his sentence did not provide for consecutive sentences with regard to each count. *See* Trial Court Opinion filed 5/6/09 at 5. Rather, for example, with regard to the 244 counts of theft by unlawful taking, the trial court sentenced Mastromarino to consecutive terms on 32 of the 244 counts and imposed concurrent sentences for the remaining counts. With regard to the 16 counts of abuse of corpse, the trial court sentenced Mastromarino to consecutive terms on 14 of the 16 counts and imposed concurrent sentences for the remaining counts.

¶ 12 Thus, we conclude the aggregate sentence of twenty-five years to fifty-eight years in prison is neither grossly disparate to Mastromarino's conduct nor does it "viscerally appear as patently 'unreasonable.'" *Gonzalez–Dejusus,* 994 A.2d 595, 599. In seeking a reduction in his aggregate sentence, Mastromarino is seeking a further "volume discount" because the crimes occurred during one criminal enterprise.

¶ 13 Given the above, as in *Gonzalez–Dejusus,* we conclude Mastromarino has not raised a substantial question that the aggregate sentence imposed was inappropriate or contrary to a fundamental norm underlying the sentencing code. *See id.*

¶ 14 Mastromarino next suggests that, without explanation, his aggregate sentence is clearly excessive when compared to his co-defendants' sentences, i.e., the Garzone Brothers each received an aggregate sentence of 8 to 20 years in prison.[6] We conclude this claim raises a substantial question. *Commonwealth v. Cleveland,* 703 A.2d 1046 (Pa.Super.1997) (holding substantial question raised where the appellant averred an unexplained disparity between his sentence and that of his co-defendant); *Commonwealth v. Krysiak,* 369 Pa.Super. 293, 535 A.2d 165, 167 (1987) ("[D]isparate sentences between two or more co-defendants constitutes a substantial question necessitating our exercise of jurisdiction to review."). This claim, however, is meritless.

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Anderson,* 830 A.2d 1013, 1018 (Pa.Super.2003) (quotation omitted).

¶ 15 The law is well-settled that co-defendants are not required to receive identical sentences. *See Krysiak, supra.* Generally, a sentencing court must indicate the reasons for differences in sentences between co-defendants. *Krysiak, supra.* "This is not to say, however, that the court must specifically refer to the sentence of a co-defendant. Rather, it requires that when there is a disparity between co-defendants' sentences, a sentencing court must give reasons particular to each defendant explaining why they received their individual sentences." *Cleveland,* 703 A.2d at 1048.

¶ 16 Here, the trial court provided ample reasons for Mastromarino's sentence, and in particular, explained the disparity in sentencing. For example, the trial court stated the following on the record during sentencing:

I am going to be taking into account everything that was presented ... during [the] sentencing hearing.[7] I want everybody to know, everybody who came here who were victims of these crimes, I take into account everything you said as well as everything that you wrote to me....Also [I am] taking into account everything that was submitted to me on behalf of the defendants....I

---

6. We note that the Garzone Brothers and Mastromarino were sentenced by the same judge during the same sentencing hearing. *See* N.T. 10/22/09.

7. We note that a presentence investigation report was prepared for Mastromarino. *See* N.T. 10/22/08 at 29–30.

have also taken into account and carefully read the submissions from all three— I should say—all four defense counsel who are here as well as the submissions from the District Attorney's Office.

I am going to take into account the acceptance of responsibility that all of the defendants have shown by admitting to these charges. And I am taking into account their actions avoiding the need for a great many people to go through what I am sure would be a traumatic trial.

I am taking into account, as I am required by law to do, the sentencing guidelines[,] . . . the need for the protection of the public, [and] the gravity of these offenses in relation to their impact on the victims. I am reading here the Sentencing Code as well as the rehabilitative needs of the defendants as the Supreme Court of Pennsylvania instructs me to take those into account in every case. . . .

I don't think there is any dispute as to this that these actions which give rise to all of us being here today are terrible crimes, that they had a traumatic impact on a great number of people. All of you have had profound and negative impact on a great many victims of these offenses. . . . The most dramatic to me, but I am not in any way diminishing the importance to anyone, but the people who came up and described that they received these tissues, having to go through testing for things such as syphilis and AIDS because of what was done through the BTS, through Mr. Mastromarino's company, is mind boggling. I can't imagine how this has affected their lives.

There is a second class of victims here for which I am going to take their suffering into account. And it was very profoundly and very convincingly described to me, listening to a number of people here describe—I see the gentleman in the front row here describe how he can't think about his mother without the horror of the facts of this case playing in his mind.

We had some discussion here—all of us—about why this case is not a garden variety guidelines case. . . . And I will find that the guidelines, the guidelines simply do not contemplate this kind of impact. . . . And that is an important factor that is going to guide my decision in this case.

Also, as I said previously, I am going to take into account acceptance of responsibility. . . .

Mr. Mastromarino, let me start, some comments particularly with you. This is another area where I take separate issue with the Commonwealth. It seems to me quite clear, sir, you are the most culpable person in connection with this case, that you are the architect of this scheme that most of us simply can't contemplate.

There was a phrase used by [the district attorney] here, "basic human decency," and I can understand where she is coming from. It really does seem, sir, that your conduct did display a complete lack of regard for basic human decency. It is truly incomprehensible how somebody could potentially take tissues that were displaced and put them in the [stream] of commerce, especially someone like you, that is so trained as a dentist and you didn't need to find yourself in this position.

So that is just an egregious and terrible behavior for which I am going to have to fashion an appropriate punishment. . . .

What I have decided to do is give you all sentences within the sentencing guidelines, but I am going to group a

number of them consecutively so, for two reasons. First of all, to reflect the fact that each and every one of the different charges represents a separate and distinct wrong and also to reach [an] aggregate sentence that I think appropriately is commensurate with the culpability that you demonstrated in this case.

N.T. 10/22/08 at 259–265 (footnote added). Moreover, in sentencing the Garzone Brothers to a lesser aggregate sentence than Mastromarino, the trial court informed the Garzone Brothers, "I am also going to acknowledge the fact that you have less of a role than Mr. Mastromarino." N.T. 10/22/08 at 269.

¶ 17 Based on the aforementioned, we conclude the trial court sufficiently explained the reasons for Mastromarino's sentence, and in particular, the reasons justifying the disparity between his sentence and his co-defendants' sentences. Therefore, this claim is meritless.

¶ 18 Affirmed. Appellant's Motion for Leave to Conform Brief is GRANTED.