J-S04041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEVON MALCOM WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1261 EDA 2023 |

Appeal from the Judgment of Sentence Entered December 19, 2022
In the Court of Common Pleas of Montgomery County
Criminal Division at No:  CP-46-CR-0002148-2021

BEFORE:  BOWES, J., STABILE, J., and LANE, J.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 22, 2024**

Appellant, Devon Malcom Williams, appeals from the December 19, 2022 judgment of sentence imposing an aggregate thirteen to twenty-six years of imprisonment for multiple convictions of robbery, burglary, conspiracy and related offenses.  Appellant raises issues relating to the trial court's denial of his motion to suppress and the discretionary aspects of his sentence.  Upon review, we affirm in part and vacate in part.

At the conclusion of the suppression hearing, the trial court made the following findings of facts relative to this appeal:[1]

> On January 16, 2021, Pottstown Police issued a be-on-the-lookout ["BOLO"] bulletin for Annette Bowen following a home invasion at Charlotte Street in Pottstown.

---

[1] We limit our scope of review to the record created during the suppression hearing, since when reviewing a motion to suppress evidence, we may not look beyond the suppression record.  ***In re L.J.,*** 79 A.3d 1073, 1080 (Pa. 2013).

Authorities were able to obtain surveillance video from the residence [at the time of the incident] which showed one of the actors was an African American [male] who was wearing whitewashed jeans with black knee patches, [and] a black Nike-hooded sweatshirt with a digital camera design on the sleeves.

Upon receipt of the [BOLO] alert, the Lansford Police began making extra patrols of the area near Defendant Bowen's residence.

On January 18, 2021, at approximately 2:00 p.m., [Chief] Jack Soberick saw a gray vehicle pull into a parking spot in front of Defendant Bowen's residence.

Defendant Bowen, an African American male, and a Caucasian male all exited the vehicle and entered the residence.

Defendant Bowen later exited the residence with these two individuals, and all three got into the vehicle and began to drive away.

[Chief] Soberick conducted a stop of the vehicle.

When stopping the vehicle, he obtained information from a confidential informant that was known to police and deemed credible that [Appellant] had been [in] possession of firearms and silver bars while inside the residence.

[Chief] Soberick was in constant contact with Pottstown authorities, supplied this information to them, in addition to the description of the defendant.

Based upon the fact that this information matched the description of one of the individuals involved with the home invasion, Pottstown Police directed [Chief] Soberick to detain [Appellant].

[Appellant] was subsequently transported to the [Lansford] police station.

While in the station, authorities did not ask [Appellant] about the incident.

During this interaction, [Appellant] asked why he was being detained.

Chief Soberick of the Lansford Police responded that [Appellant] fit the general description of a person who had been involved in an incident in Pottstown.

When [Appellant] asked, what general description meant, Chief Soberick responded that the person had bad teeth and he informed [Appellant] that his teeth were misaligned and had poor cosmetic appearance.

In response, [Appellant] uttered, you mean they could see my teeth in the video.

The Pottstown [Police] arrived in Lansford around 5:30 p.m.

Upon their arrival, Pottstown authorities noticed that [Appellant] was wearing similar shoes to those worn by one of the suspects in the video from the robbery [in Pottstown].

Authorities later conducted a search [of the Lansford residence].

During their search, authorities recovered items which matched the items stolen in the home invasion.

During the search of Defendant Bowen's cell phone authorities observed multiple messages between Defendant Bowen and a phone number ending in 1101.

One message read: Please, Devon. I love you. Answer me.

Another message read: I love you, Devon.

Based on these messages and other information indicated Defendant Bowen and [Appellant] were in a relationship.

Authorities conclude the number ending in 1101 belonged to [Appellant].

Authorities had also executed a search warrant with respect to [Charles] Williams' cell phone, [who was suspected to be a third person involved in the Pottstown robbery].

> When examining the contents of Charles Williams' cell phone, there are text messages between his phone number and the phone number ending in 1101.
>
> The number ending in 1101 sends a text message on the date of the robbery stating, ["]Top of the Morning, Bro. I'm up and ready.["]
>
> Authorities also found other phone calls and text messages between Charles Williams' phone and the phone number ending in 1101 on the day of the robbery as well as the day after.
>
> Based upon this information and other information contained in the search warrant application, Corporal Todd Istenes of the Pottstown Police Department obtained a signed search warrant from Judge Walker of the Montgomery County Court of Common Pleas to obtain subscriber information and call [] detail records relating to the phone number ending in 1101.
>
> The [trial court] finds the testimony of the [Chief] was credible.

N.T., Open Guilty Plea/Suppression Hearing, 7/22/22, at 131-35.

In his suppression motion, Appellant sought to suppress: (1) his arrest; (2) a statement he made to police; (3) the seizure of his cell phone; (4) the search warrant for his cell phone number ending in 1101; and (5) any information from a search of his cell phone. *See* Motion to Suppress, 7/13/22. He argued his arrest and subsequent seizure of his cell phone were unlawful. *Id.* at 3-4. The trial court denied the motion to suppress.

After a three-day trial, a jury found Appellant guilty of forty-one counts of robbery, conspiracy, and related offenses. Appellant was sentenced to an aggregate term of thirteen to twenty-six years of incarceration. The trial court denied Appellant's post-sentence motion, and this timely appeal followed. Appellant raises four issues for our review:

1. Did the lower court err in denying [Appellant]'s motion to suppress because [Appellant]'s arrest was not supported by probable cause and thus, his cell phone was illegally searched and seized and his statement was not preceded by requisite *Miranda*[2] warnings?

2. Did the lower court err in denying [Appellant]'s motion to suppress cell phone records for [Appellant]'s phone (484-735-1101) where the affidavit of probable cause supporting the search warrant for the records failed to establish a nexus between the phone number and the crime in question?

3. Did the lower court impose an illegal sentence in that it imposed consecutive sentences for multiple counts of conspiracy when said counts were part of the same common or continuous conspiratorial relationship?

4. Did the lower court abuse its discretion when it sentenced [Appellant] to an aggregate term of 13 to 26 years imprisonment since such a sentence was significantly more severe than the sentence imposed on co-defendant, Annette Bowen, despite the fact that she was more culpable and had a higher prior record score?

Appellant's Brief at 4-5.

Our standard of review when addressing a challenge to the denial of a suppression motion is

limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted.

_____

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (internal citations omitted). Our scope of review is limited to the record created during the suppression hearing. *In re L.J.*, *supra*.

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super. 2019). "If there is sufficient evidence of record to support the suppression court's ruling and the court has not misapplied the law, we will not substitute our credibility determinations for those of the suppression court judge." *Commonwealth v. Johnson*, 86 A.3d 182, 187 (Pa. 2014).

Appellant first claims that the trial court erred in denying his motion to suppress because his arrest and subsequent seizure of his cell phone incident to arrest were not supported by probable cause.[3] *See* Appellant's Brief at 17-28. He contends that he was handcuffed "immediately after initiating the traffic stop" and the only basis for the traffic stop was that Appellant "fit the description in the BOLO notice." *Id.* at 21. Moreover, he asserts that Chief Soberick received information from the CI after he was arrested; therefore,

---

[3] Appellant also asserts that his statement to police should be suppressed because he was not provided *Miranda* warnings. The entirety of Appellant's argument on this issue is: "Since his detention constituted an illegal arrest unsupported by probable cause the lower court erred in failing to suppress [the statement as] fruits of the arrest." Appellant's Brief at 28. We find this issue waived because Appellant failed to develop an adequate argument. *See Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) (*en banc*).

that information cannot be considered in a probable cause analysis. *Id.* We disagree.

Here, the trial court found Chief Soberick had probable cause to arrest Appellant:

> A police officer who actually makes a warrantless arrest does not need to have sufficient information to establish probable cause to arrest as long as the officer ordering the arrest possessed probable cause.
>
> Here[, Appellant] **was taken into custody by Lansford Police** pursuant to the Pottstown Police's directive to obtain it.
>
> Authorities have probable cause to seize [Appellant] where he was seen in a car with Defendant Bowen, who had been identified by the robbery victims, during the stop.
>
> A CI informed [Lansford] authorities that there were guns and silver bars in the [Lansford] residence at 441 West Patterson Steet.
>
> These were the same items reported stolen during the robbery.
>
> Further, [Chief] Soberick of Lansford observed [Appellant] entering and departing from the Lansford residence.
>
> Additionally, [Chief] Soberick's description of [Appellant]'s [characteristics to] Pottstown authorities allowed authorities to say that [Appellant] matched the description of the suspect in an armed robbery which had occurred just two days prior in Pottstown.

*Id.* at 136 (cleaned up; emphasis added). In addition to the above, Chief Soberick obtained information from Bowen's neighbor that Appellant and a white male were seen going in and out of Bowen's residence. *Id.* at 77. He also searched Bowen's social media and found photos of Bowen and Appellant together, indicating they had a personal friendship or relationship. *Id.* at 75.

Appellant's assertion that he was handcuffed "immediately after initiating the traffic stop" is based on one part of an answer Chief Soberick provided: "I took them all into custody and detained them and contacted Pottstown [police]." *Id.* at 79. However, the Commonwealth then specifically asked Chief Soberick about the timeline of the traffic stop:

Q:     Okay.  And so to get the timeline straight.  You conduct the stop.  Everyone gets out of the car.

A:     That's correct.

Q:     And then when do you get the information from the CI?

A:     During the traffic stop, actually.

Q:     Okay.  At this point during the traffic stop **when you got that information from the CI**, you have the **descriptor of the person that was involved** in the armed robbery, along with Annette Brown, **what happened after** that?

A:     **They were detained** and transported back to the Lansford Borough Police Department to await the arrival of the detectives from Pottstown.

N.T., 7/22/22, at 81 (emphasis added).  Based on a review of the entire transcript, it is obvious the trial court found Appellant was arrested after Chief Soberick obtained information from the CI and Corporal Istenes of the Pottstown police department.  That finding is supported by the record.

Appellant argues that Chief Soberick's testimony that Appellant matched the "general description" provided in the BOLO is the only relevant evidence that can be considered in a probable cause analysis.  *See* Appellant's Brief at 21.  It is undisputed that Chief Soberick consistently testified that Appellant "fit the description" of the suspect in the Pottstown robbery.  It also is

undisputed that the description on the BOLO merely said, "two Black males." N.T. 7/22/22, at 74. Chief Soberick was asked whether he was given other characteristics of the suspect, and he said "**[n]ot initially**, no." *Id.* (emphasis added). This statement implies that at some point, he was provided additional characteristics of the robbery suspect. However, no follow-up questions were asked at that time. Significantly, Chief Soberick testified that he was in constant communication with Corporal Istenes from the time of the traffic stop until Appellant arrived at the Lansford police station. *Id.* at 83, 97-98.

During the traffic stop, Chief Soberick obtained information from a CI. *Id.* at 80. The CI said: (1) that Appellant was inside the Lansford residence with Bowen; (2) that weapons were inside the residence; and (3) he provided a list of items in the residence that the CI believed were stolen. *Id.* at 82, 86. When Chief Soberick informed Corporal Istenes of the list of items, Corporal Istenes said these items matched the items stolen during the Pottstown robbery. *Id.* at 98. *Additionally, during the traffic stop, Chief Soberick described Appellant to Corporal Istenes, and Corporal Istenes said Appellant matched the suspect in the surveillance video from the Pottstown robbery*. *Id.*

The record supports that Chief Soberick's testimony that Appellant "fit the description" was based on the information he received from Corporal Istenes, and not simply the BOLO description. While Chief Soberick was asked several times about the description in the BOLO, he was never asked to

describe what he told Corporal Istenes regarding Appellant's appearance and characteristics. When considering whether an officer possesses probable cause, we must bear in mind that:

> Pennsylvania adheres to the vertical approach of the collective knowledge doctrine, which instructs that an officer with the requisite level of suspicion may direct another officer to act in his or her stead. However, where, . . . the arresting officer does not have the requisite knowledge and was not directed to so act, we hold the seizure is still constitutional where the investigating officer with probable cause or reasonable suspicion was working with the officer and would have inevitable and imminently ordered that the seizure be effectuated.

*Commonwealth v. Yong*, 177 A.3d 876, 890 (Pa. 2018). Here, Chief Soberick was directed by Corporal Istenes to arrest Appellant. Corporal Istenes viewed the surveillance video of the robbery, identified the male suspect, was provided a description of Appellant from Chief Soberick, and determined the description matched the suspect in the video. Moreover, Appellant was with Bowen, who was identified as a suspect by the robbery victims. As a result, Corporal Istenes directed Chief Soberick to arrest Appellant. *Id.* at 98.

Accordingly, we conclude that Chief Soberick possessed probable cause to arrest Appellant for the Pottstown robbery pursuant to the collective knowledge doctrine. *Yong, supra.* The trial court's findings of facts are supported by the record, and the conclusions of law drawn from those facts are correct. *Yandamuri, supra.* Therefore, the trial court properly found Appellant's arrest was lawful and denied his motion to suppress.

Additionally, we note that the only item Appellant sought to suppress was his cell phone and information obtained from that phone. Although the phone was seized pursuant to a search warrant, police were unable to access Appellant's cell phone. N.T., 7/22/22, at 110. Thus, there was no evidence from the cell phone that could have been suppressed.

Appellant also claims that the trial court erred in denying his motion to suppress the subscriber information and call detail records for Appellant's phone because the affidavit of probable cause failed to establish a nexus between the phone number and the Pottstown robbery. *See* Appellant's Brief at 28-35. He contends that none of the averments in the affidavit of probable cause "contain evidence that [Appellant] used a cell phone in the planning of the robbery or possessed or used a cell phone during the crime." *Id.* at 35. We disagree.

To be valid, a search warrant must be supported by probable cause. ***Commonwealth v. Jacoby***, 170 A.3d 1065, 1081 (Pa. 2017). Regarding search warrants, our Supreme Court has explained:

> The existence of probable cause is measured by examining the totality of the circumstances. Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he [or she] has reasonably trustworthy information are sufficient in and of themselves to warrant a [person] of reasonable caution in the belief that a search should be conducted. A magisterial district judge, when deciding whether to issue a search warrant, must make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. Conversely, [a] court reviewing a

- 11 -

search warrant determines only if a substantial basis existed for the magistrate to find probable cause.

*Id.* at 1081-82 (internal citations and quotation marks omitted). In determining whether a warrant was supported by probable cause, our scope of review is limited to the four corners of the accompanying affidavit. *Commonwealth v. Coleman*, 830 A.2d 554, 560 (Pa. 2003). A police officer's experience and training may be relevant factors in the probable cause determination. *Thompson*, 985 A.2d at 935. "Probable cause, at a minimum, must be individualized to the suspect and the circumstances of the case; it requires more than generalized statements about human behavior that are unsupported by the specific facts." *Jacoby*, 170 A.3d at 1084.

In finding that the warrant was supported by probable cause, the trial court stated:

> As referenced earlier, there was ample probable cause to support [Appellant]'s arrest, and these same facts provide probable cause for an issuance of a search warrant with the phone ending in 1101.
>
> Additionally, authorities included details regarding the results of the search conducted pursuant to the search warrant on the Lansford residence which also linked [Appellant] to the Pottstown home invasion.
>
> There was also evidence linking this particular number to [Appellant] which was not procured as a result of any information obtained from his arrest.
>
> This includes text messages recovered from Defendant Bowen's phone pursuant to a validly issued consent and text messages recovered from Charles Williams' phone [pursuant to] a validly issued search warrant.

> The [affiant] referenced multiple factors which demonstrated the significant probability that [Appellant] had engaged in criminal activity and the evidence of this activity would be found on the phone number ending in 1101.
>
> The commonsense assessment given all the information set forth in the affidavit demonstrates there was specific nexus between the phone number and the suspected crimes committed.

N.T., Open Guilty Plea/Suppression Hearing, 7/22/22, at 139-40. We agree.

We find that, within the four corners of the affidavit, a substantial basis existed for the magistrate to find probable cause. *See Jacoby, supra.* Corporal Istenes articulated specific and individualized facts to establish probable cause to obtain subscriber information and call detail records for cell phone xxx-xxx-1101,[4] namely: (1) a home invasion robbery occurred in Pottstown; (2) surveillance video captured three suspects, a female and two males; (3) the victims of the robbery identified Bowen as the female suspect; (4) the surveillance video provided officers with physical characteristics of and identifiable clothing worn by the male suspects; (5) Appellant was arrested with Bowen; (6) items from the Pottstown robbery, mail addressed to Appellant and clothing consistent with the clothing worn by one of the male suspects in the surveillance video was recovered from Bowen's residence; (7) a consent search of Bowen's cell phone revealed text messages that indicated cell phone number xxx-xxx-1101 belonged to Appellant; (8) Bowen implicated

_____

[4] The full identification of the number has been redacted for security purposes.

Charles Williams in the robbery; (8) several items stolen from Pottstown were recovered in Charles Williams' room; and (9) a search of Charles Williams' cell phone revealed several communications with cell phone number xxx-xxx-1101 on the day of, and the day after, the robbery. **See** Commonwealth's Response to Defendant's Motion to Suppress, Exhibit C-1.

Additionally, Corporal Istenes described his knowledge and experience from prior investigations involving cell phone data:

> I understand that cellular phone providers such as Verizon keep and maintain a wide range of information in the ordinary course of their business. This information, known generally as "subscriber information" includes information about the person(s) associated with the account that pays for cellular service. This information includes the name, physical address (location of service), and billing information associated with the purchase of and continuing payments for the use of that account. I also understand that providers like Verizon keep information about the use of their cellular devices. This information includes the IP (or internet protocol) address associated with that phone – a unique identifier associated with that device used to access the internet. It will also include information about the calls and text messages either made by or sent to the cell phone. These "call detail records" will include the number dialed/from which the call or text message was received, the duration of the call, potentially the content of the text message, as well as data about the cellular towers used to complete the communications. I understand that cellular devices . . . access the internet and sen[d]/receive calls by connecting wirelessly to tower(s), the locations of which are likewise saved. Information about these towers – specifically their sector and orientation information, which can provide information about the physical direction that the device was facing relative to the tower, as well as their physical location, address, longitude and latitude and related identifying data – can be used to identify the area in which the cellular device was located at the time of its use and, by extension, the location of the user at particular times. This cell tower data, GPS location and RTT are necessary to determine the location of the cell phone with phone number xxx-xxx-1101 from 11/9/2020 until 01/18/2021.

*Id.* He further stated that the planning and execution of a home invasion robbery, such as the one committed here, "required forethought and communication among co-conspirators to plot and carry out." *Id.* Under the totality of the circumstances, the trial court properly denied suppression after finding that the search warrant was supported by probable cause. *Jacoby, supra.*

In his third issue, Appellant contends that the trial court imposed an illegal sentence when it imposed sentences for 14 counts of conspiracy that arose out of the same conspiratorial relationship. *See* Appellant's Brief at 36-38. The Commonwealth and the trial court agree that Appellant's sentence for multiple counts of conspiracy is illegal. *See* Trial Court Opinion, 7/19/23, at 16; *see also* Commonwealth's Brief at 26. However, the Commonwealth and the trial court contend that Appellant was only sentenced on five concurrent counts of conspiracy, and the remaining conspiracy counts merged for sentencing purposes. *See id.*

Appellant was initially charged with 105 total counts, 39 of which were conspiracy. He was sentenced on five counts of conspiracy – counts 4, 14, 28, 56, and 72. Appellant was found guilty of ten additional counts of conspiracy; however, those merged for sentencing. The remaining 24 counts of conspiracy were subsequently *nolle prossed*. Therefore, we agree that Appellant was sentenced on five counts of conspiracy, and that the sentences at four of those counts - 14, 28, 56, and 72 are to be vacated. However,

remand is not necessary because those sentences are concurrent and *vacatur* of those four counts does not upset the overall sentencing scheme. **See Commonwealth v. Thur**, 906 A.2d 552, 569-70 (Pa. Super. 2006); **see also** Trial Court Opinion, 7/19/23, at 16-17.

In his fourth issue, Appellant challenges the discretionary aspects of his sentence. Specifically, he contends that his sentence is more severe than his co-conspirator, Bowen, and his sentence must be reversed due to the "disparate treatment of factually identical cases." Appellant's Brief at 39-40.

Challenges to the discretionary aspects of sentencing are not entitled to appellate review as a matter of right. **Commonwealth v. Clemat**, 218 A.3d 944, 959 (Pa. Super. 2019). Rather, such challenges are considered petitions for allowance of appeal. **Id.** Thus, an appellant must invoke our jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect pursuant to Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. **Id.**

Here, Appellant filed a timely notice of appeal, properly preserved the issue in his post-sentence motion, and his brief complies with Rule 2119(f) by providing a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of his sentence. A claim of

"disparate sentences between two or more co-defendants constitutes a substantial question necessitating our exercise of jurisdiction to review." *Commonwealth v. Krysiak*, 535 A.2d 165, 167 (Pa. Super. 1987). Thus, Appellant has invoked our jurisdiction, and we may address the merits. We review a sentencing court's determination for an abuse of discretion:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Clemat*, 218 A.3d at 959. A sentencing court must state its reason for the sentence on the record. 42 Pa.C.S.A. § 9721(b); *Commonwealth v. Fowler*, 893 A.2d 758, 767 (Pa. Super. 2006). This can be satisfied by a trial court stating on the record that it reviewed the pre-sentence investigation report. *Id.* Our Supreme Court has stated:

> Where [a] pre-sentence report exists, we shall continue to presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself. In order to dispel any lingering doubt as to our intention in engaging in an effort of legal purification, we state clearly that sentencers are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed. This is particularly true, we repeat, in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion. It would

- 17 -

be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand.

*Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988).

Moreover, "Pennsylvania's sentencing system . . . is based on individualized sentencing." *Commonwealth v. Walls*, 926 A.2d 957, 966 (Pa. 2007). It is well-settled that co-defendants are not required to receive identical sentences; however, the trial court must indicate its reasons for differences in sentences between co-defendants. *Commonwealth v. Mastromarino*, 2 A.3d 581, 589 (Pa. Super. 2010). "This is not to say, however, that the court must specifically refer to the sentence of a co-defendant. Rather, it requires that when there is a disparity between co-defendant's sentences, a sentencing court must give reasons particular to each defendant explaining why they received their individual sentences." *Id.*

Here, the trial court had the benefit of a pre-sentence investigation and sentencing memorandum prepared by both sides.[5] N.T., Sentencing 12/19/22, at 9. This alone satisfies the trial court's requirement to place its reasons for imposing a particular sentence on the record. *Fowler, supra.* Moreover, the trial court did state its reasons for the sentence imposed:

> The jury found that you and two others robbed and terrorized three victims at gun point. They were in fear for their life and were terrorized by the encounter. When people are at their home, which one of the victims was, or at the home of a friend, they should feel safe.

---

[5] We note that Appellant and Bowen were not sentenced on the same date. Bowen entered a guilty plea on July 22, 2022 and was sentenced on November 1, 2022, after Appellant's trial.

You and the other two stole that sense of security from those victims. Your conduct to rob and terrorize was planned and premeditated. As a result of what the jury found, you pose an immediate and future threat to the public, which necessitates a significant period of incarceration. Your actions involved multiple victims and a sentence is warranted for each of those victims. Otherwise, there would be a volume discount for your criminal conduct.

My sentence takes into account your egregious conduct, your victims, what they went through, and the need to protect the public. I do have the discretion to sentence in a mitigated range. To do so, I have to find there are mitigating factors. I cannot find any mitigating factors that justify a mitigated sentence. There's nothing redeeming about how you conducted yourself. Your conduct warrants a lengthy period of incarceration.

As to Annette Bowen, this was raised. There is a significant difference. Annette Bowen cooperated. Our system relies on people who cooperate, and that more than justifies her having a lesser sentence.

N.T., Sentencing 12/19/22, at 29-30. In its 1925(a) opinion, the trial court further explained its reasons for the disparity in sentencing:

Ms. Bowen, at great risk to her well-being, chose to cooperate in the prosecution of this matter, accepted full responsibility for her actions and demonstrated remorse. Ms. Bowen also did not engage in any of the physical assaults upon the victims either by physically striking them or utilizing duct tape to tie up the victims. [Appellant], conversely, took an active role in assaulting the victims. [Appellant] also accepted no responsibility for his actions at the sentencing hearing, blamed his situation on his former attorney and the court system, and only demonstrated token remorse for the victims at the end of his allocution.

Trial Court Opinion, 7/19/23, at 22-23. The trial court also noted that Appellant threatened Bowen's safety during transport from the jail to the courthouse during Appellant's trial. *Id.* at 19.

Upon review, the record clearly demonstrates that the trial court stated its reasoning for imposing different and individualized sentences for Appellant and Bowen. ***Mastromarino, supra.*** Thus, we find no error.

Judgment of sentence affirmed in part and vacated in part.

Judge Bowes joins the memorandum.

Judge Lane files a concurring/dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/22/2024