J-S26023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LORETTA PAULINE STOKES-MCCLUSICK | : | |
| | : | |
| | : | No. 1113 MDA 2024 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered May 29, 2024
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0000402-2023

BEFORE: LAZARUS, P.J., OLSON, J., and BECK, J.

MEMORANDUM BY OLSON, J.: **FILED: AUGUST 25, 2025**

Appellant, Loretta Pauline Stokes-McClusick, appeals from the judgment of sentence entered May 29, 2024, as made final by the denial of her post-sentence motion on July 12, 2024. We affirm.

The trial court summarized the relevant facts and procedural history of this case as follows.

> On or about May 26, 2022, at approximately 6:49 p.m., the Pennsylvania State Police ("PSP") at Rockview received a request for assistance involving an 84-year-old woman named Rosemarie Maud Stokes ("the victim"), who had been admitted to the emergency department at Mount Nittany Medical Center ("MNMC") with serious bodily injuries requiring priority care due to risk of death or amputation. PSP Rockview was advised by the Centre County Office of Aging that it would be investigating the victim's injuries and sought PSP Rockview's assistance. The victim had been in the physical care of her daughter, [Appellant].

Trooper Jonathan Hodges with PSP Rockview arrived at the MNMC emergency department at approximately 7:07 p.m. on May 26, 2022. Trooper Hodges interviewed registered nurse Kayla Ashley Meyer who was caring for the victim. Meyer described that when she entered the emergency room to assist in caring for the victim, she was screaming in pain as the attending physician, Dr. Andrew Catherine, attempted to administer saline into large "tunneling wounds" on the victim's legs. The wounds reached all the way to the bone and emitted a foul odor. Meyer described the wounds as "horrific." The victim complained of being cold and was found to have a core body temperature of approximately 33 degrees Celsius/91 degrees Fahrenheit. The victim's blood pressure was 70/30, which was the lowest blood pressure Meyer had ever seen as a nurse. Additionally, the victim had a catheter, but the collection bag had not been changed, was filled with thick, brown urine, and had mold growing in it.

There were maggots crawling out of three distinct holes found in the victim's vaginal area. Those holes appeared to have been caused by maggots tunneling into the victim's body. The holes made it difficult for MNMC staff to locate the appropriate area in which to insert a fresh catheter. Meyer stated that it appeared as though the victim had not been moved in days. She had urine, feces and dirt smeared over her buttocks, pelvic area and legs.

[Meyer,] further described that the victim complained that they would get mad at her when the victim asked for food at home. The victim weighed between 80-90 pounds at the time of admission, which was a significant decrease from her weight at a hospital admission approximately five weeks prior. In an effort to warm the victim, MNMC nurses placed a full body "bear hugger" garment on her that is used to raise the body temperature of hypothermic patients. Meyer concluded her interview with Trooper Hodges by stating that it would be very difficult for the victim to recover from her injuries and that she may die from them.

Following his interview with Meyer, Trooper Hodges interviewed emergency physician Dr. Catherine. Dr. Catherine reported that the victim came into the hospital with large wounds. Upon entering the examination room, Dr. Catherine observed the victim and numerous MNMC staff surrounding her. The staff reported finding and removing a dirty catheter from the victim's body. Staff also reported that they found and removed maggots from the victim's vaginal area. Dr. Catherine observed large wounds to the victim's legs and knees, and further reported that the victim was septic, would likely lose a leg, and may die from her injuries. Dr. Catherine and the three nurses interviewed by Trooper Hodges all opined that the victim's condition and injuries appeared to be a result of negligence by her caregiver. The victim was admitted to MNMC for further treatment of conditions including multiple Stage IV decubitus ulcers, contracted legs, septic shock, low blood pressure, and hypothermia.

During the ensuing investigation, the PSP discovered that the victim lived with and was under the care of her daughter, [Appellant], at the time of the victim's admission to MNMC. On May 26, 2022, Trooper Hodges obtained a search warrant for [Appellant's] residence. The living room, where the victim's hospital bed was located, was cluttered with garbage strewn about the furniture and floor. The victim's bed was without sheets and few medical supplies were observed. There was little room to navigate a wheelchair, and the victim's wheelchair contained what appeared to be blood on the foot pedals. The kitchen was cluttered, and the refrigerator/freezer was filthy and contained little food.

On May 26, 2022, Trooper Hodges interviewed [Appellant] at PSP Rockview Station. [Appellant] acknowledged that she was the caretaker for her mother, the victim. [Appellant] further acknowledged that she was aware of the victim's injuries. [Appellant] described a bed rash that the victim had for two weeks that got "really bad." She described an area near the victim's calf that had "sunk in." [Appellant] stated that the injuries on the victim's legs were present for the previous two weeks. [Appellant] further stated that her mother was

bedridden. Apparently, [victim] was eating regularly but ate differently than [Appellant] and her husband. [Appellant] stated that the victim would "pocket" food and needed to be watched, and that the victim did not want to swallow food. [Appellant] also stated that the victim wore adult diapers and had a catheter in place. [Appellant] alleged that she regularly changed the victim's diapers and emptied her catheter bag. [Appellant] described the victim's urine as "dark," but stated that she would reuse the same catheter bag and not clean it regularly.

[Appellant] then described the process of moving the victim from her bed, stating that she had a bad back and had difficulty moving her mother. [Appellant] described the injury on the victim's right calf and said it was getting bad again and that the bone was exposed. The victim's wound on her left calf also exhibited exposed bone. [Appellant] stated that the left calf injury first appeared two weeks prior. Trooper Hodges also asked [Appellant] whether she recalled any issues or injury around the victim's private areas or if she observed any bugs, to which [Appellant] replied that there was one such occasion, when she observed a small worm outside on her mother's wheelchair. However, [Appellant] also stated that she had seen some bugs on the floor inside her house and believed that they were maggots.

[Thereafter, PSP investigated the circumstances preceding the victim's admission to MNMC in May 2022]. PSP's investigation revealed that in February 2022, the victim had completed a course of inpatient treatment at a rehabilitation hospital, having been diagnosed with C. difficile, COVID-19, dementia with superimposed acute confusional state, acute metabolic encephalopathy, sepsis/bacteremia, acute kidney injury, pressure wounds on her right and left buttocks, and a urinary tract infection. [The victim was discharged into Appellant's care]. Her discharge instructions emphasized the need for wound care follow up and to be repositioned frequently. A provision was made for her to receive home health care through Centre Homecare, to include skilled nursing, physical therapy and occupational therapy.

Skilled nursing visits commenced on March 8, 2022. At that visit, the nurse noted two pressure ulcers in the victim's buttock/hip areas. The nurse educated [Appellant] on repositioning the victim every two hours and explained the need to keep her clean and dry because she was at high risk for pressure sores.

There was a skilled nursing visit on March 11, 2022, at which the nurse noted the continued presence of two pressure ulcers in the victim's buttocks area. [Appellant] cancelled the visit scheduled for March 17, 2022. At a visit on March 18, 2022, the nurse described the pressure ulcer in the victim's buttocks as small, noting that the surrounding skin was healthy.

At the next visit on March 23, 2022, one of the ulcers had healed, and the other remained small. The nursing assessment cautioned that the victim remained at high risk of developing pressure sores.

There were skilled nursing visits on March 25, 2022, and April 1, 2022, with no appreciable changes in the victim's status. At the next visit on April 9, 2022, the assessment noted "several abraised areas and pressure areas all over upper shoulder and hips." The nurse requested an evaluation at the emergency room of MNMC, and the victim was admitted on April 11, 2022, for treatment of gastrointestinal distress and wound care.

On April 22, 2022, the physician recertified the victim to skilled, in-home nursing care and gave specific instructions for the care of the victim's sacral, buttock, and hip pressure ulcers. The physician instructed that they were to be cleaned and new dressings were to be applied every other day by the nurse or [Appellant]. The physician ordered that the victim's catheter, which had been placed in early April, was to be changed each month.

The Centre Homecare's assessment on April 22, 2022, described the victim's care dependency. The assessment stated that the victim was entirely dependent on someone else for her grooming needs and dressing her upper and lower body. She was unable to bathe herself. She was totally dependent on the care of

another for bathing, toileting and maintaining toilet hygiene. She was bedridden and unable to turn herself. She was chairfast and unable to ambulate or wheel herself. She was unable to feed herself, unable to use the telephone, and unable to take her medications by herself.

[Appellant] cancelled the skilled nursing visit scheduled for April 27, 2022. The following day, [a] social worker [] spoke with [Appellant] and explained various home modification programs, programs to get medical supplies, and a program for free meals. [Appellant] expressed no interest in any of these programs. However, she did express interest in being paid under a program that would pay her to serve as the victim's caregiver.

A skilled nursing visit was held on April 29, 2022, which noted a small pressure ulcer on the hip, a small pressure ulcer on the anus, and several red areas on her back and buttocks. The victim and her bed sheets were smeared with excrement and her catheter was contaminated with excrement. The nurse told the [Appellant] that the victim needed to be kept clean and dry. The nurse was concerned about the care [Appellant] was providing for the victim and notified the social worker and vice president of Centre Homecare of her concern.

[Appellant] cancelled the skilled nursing visit of May 3, 2022, stating that it was "not a good day." At the next visit on May 6, 2022, the victim's status had remained essentially unchanged. On May 10, 2022, [Appellant] called Centre Homecare and reported that she did not want an occupational therapy evaluation for the victim "because she does all the care for the patient."

[Appellant] cancelled all services from Centre Homecare on May 18, 2022. At the last skilled nursing visit on May 13, 2022, [Appellant] denied the nurse access to the home, insisting that the nurse examine the victim outside. Because of that, the nurse was unable to assess the severity of the victim's pressure wounds, which [Appellant] reported as "healed." The nurse noted dark urine with a foul odor in the catheter bag, and emphasized to [Appellant] the need for having it changed.

[Appellant] insisted that she wanted to keep the catheter intact until the next appointment with the victim's physician.

Trial Court Opinion, 10/24/24, at 2-9 (internal citations omitted).

Thereafter, the Commonwealth charged Appellant *via* criminal information with count one, neglect of care-dependent person and added count two, financial exploitation of older adult or care-dependent person.[1] On March 8, 2024, Appellant entered an open *nolo contendere* plea to the aforementioned offenses. On May 29, 2024, the trial court sentenced Appellant to 40 to 80 months' incarceration on count one, neglect of care-dependent person, and to pay restitution in the amount of $2,000.00 to the victim and no further penalty on count two, financial exploitation of older adult or care-dependent person.

On June 7, 2024, Appellant filed a post-sentence motion, asking the trial court to modify her sentence on count one. The trial court convened a hearing on Appellant's motion on July 12, 2024. That same day, the trial court denied Appellant's post-sentence motion. This timely appeal followed.

Appellant raises the following issue for our consideration.

Did the trial court abuse its discretion in fashioning Appellant's sentence in that: (a) the sentence imposed was unreasonable and excessive under the circumstances of the case; (b) the reasons for the rendered sentence focused almost exclusively on the nature of the crime[; and] (c) it failed to adequately consider the factors under 42 Pa.C.S.A. § 9721(b)?

Appellant's Brief at 4 (cleaned up).

---

[1] 18 Pa.C.S.A. §§ 2713(a)(1) and 3922.1(a)(1), respectively.

On appeal, Appellant challenges the discretionary aspects of her sentence. This Court has previously explained:

It is well-settled that "the right to appeal a discretionary aspect of sentence is not absolute." *Commonwealth v. Dunphy*, 20 A.3d 1215, 1220 (Pa. Super. 2011). Rather, where an appellant challenges the discretionary aspects of a sentence, we should regard his[, or her,] appeal as a petition for allowance of appeal. *Commonwealth v. W.H.M.*, 932 A.2d 155, 162 (Pa. Super. 2007). As we stated in *Commonwealth v. Moury*, 992 A.2d 162 (Pa. Super. 2010):

An appellant challenging the discretionary aspects of his[, or her,] sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether appellant [ ] filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, [*see*] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

[*Moury*, 992 A.2d] at 170 [(citation omitted)]. We evaluate on a case-by-case basis whether a particular issue constitutes a substantial question about the appropriateness of sentence. *Commonwealth v. Kenner*, 784 A.2d 808, 811 (Pa. Super. 2001).

*Commonwealth v. Hill*, 210 A.3d 1104, 1116 (Pa. Super. 2019) (original brackets omitted).

Herein, Appellant filed a timely notice of appeal, preserved her sentencing challenge in her post-sentence motion, and included a Rule 2119(f) concise statement in her appellate brief. *See* Appellant's Brief at 9-11. Thus,

we turn to whether Appellant raised a substantial question. A substantial question exists when an appellant presents a colorable argument that the sentence imposed is either (1) "inconsistent with a specific provision of the [s]entencing [c]ode" or (2) is "contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. 2010) (citation omitted), *appeal denied*, 14 A.3d 825 (Pa. 2011). This Court will not look beyond the statement of questions involved and the prefatory Rule 2119(f) statement to determine whether a substantial question exists. *Commonwealth v. Radecki*, 180 A.3d 441, 468 (Pa. Super. 2018) (citation omitted). Moreover, for purposes of determining what constitutes a substantial question, "we do not accept bald assertions of sentencing errors," but rather require an appellant to "articulat[e] the way in which the court's actions violated [sentencing norms or] the sentencing code." *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. 2006).

In Appellant's 2119(f) statement, she contends that the trial court abused its discretion in sentencing her to serve 40 to 80 months' incarceration for the charge of neglect of care-dependent person, which is in the aggravated range of sentence. More specifically, Appellant claims that, in so doing, the trial court "handed down an excessive [sentence]" because it did not "evaluate individualized considerations, including Appellant's character, rehabilitative needs, and life situation" or the fact that Appellant's actions did not affect the community at large and, instead, "focused [] almost solely on the nature of the crime and the extent of the [victim's] injuries." Appellant's Brief at 10-11.

Insofar as Appellant claims that the trial court imposed an aggravated-range sentence without considering certain mitigating factors or otherwise based on incorrect or impermissible factors, Appellant raises a substantial question, warranting review. *See Commonwealth v. Johnson*, 125 A.3d 822, 826 (Pa. Super. 2015) ("an excessive sentence claim – in conjunction with an assertion that the court failed to consider mitigating factors – raises a substantial question") (citation omitted); *Commonwealth v. Swope*, 123 A.3d 333, 340 (Pa. Super. 2015) (holding: a claim that the appellant's sentence was unduly excessive, "together with [a] claim that the court failed to consider [a defendant's] rehabilitative needs and mitigating factors upon fashioning its sentence, presents a substantial question"); *Commonwealth v. Stewart*, 867 A.2d 589, 592 (Pa. Super. 2005) ("Based on [a]ppellant's assertion that the sentencing court considered improper factors in placing the sentence in the aggravated range, we conclude that [a]ppellant presents a substantial question on appeal.").

We adhere to the following standards:

Sentencing is a matter vested in the sound discretion of the sentencing judge. The standard employed when reviewing the discretionary aspects of sentencing is very narrow. We may reverse only if the sentencing court abused its discretion or committed an error of law. A sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

- 10 -

We must accord the sentencing court's decision great weight because it was in the best position to review the defendant's character, defiance or indifference, and the overall effect and nature of the crime.

*Commonwealth v. Cook*, 941 A.2d 7, 11–12 (Pa. Super. 2007) (internal citations and quotations omitted).

Pursuant to statute,

the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant[. …]   In every case in which the court imposes a sentence for a felony or misdemeanor . . . the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed.

42 Pa.C.S.A. § 9721(b).

Moreover, we have held:

[i]n imposing sentence, the trial court is required to consider the particular circumstances of the offense and the character of the defendant.   The trial court should refer to the defendant's prior criminal record, age, personal characteristics, and potential for rehabilitation.

*Commonwealth v. Fowler*, 893 A.2d 758, 765 (Pa. Super. 2006) (internal citation omitted).

Appellant's discretionary aspect of sentencing claim fails because, during Appellant's sentencing hearing, the trial court expressly stated that it considered the pre-sentence investigation report.   *See* N.T. Sentencing,

- 11 -

5/29/23, at 2. Given this fact, we must "presume that the sentencing judge was aware of relevant information regarding [Appellant's] character and weighed those considerations along with mitigating statutory factors." ***Commonwealth v. Devers***, 546 A.2d 12, 18 (Pa. 1988). To be sure, our Supreme Court has held:

> A pre-sentence report constitutes the record and speaks for itself. In order to dispel any lingering doubt as to our intention of engaging in an effort of legal purification, we state clearly that [sentencing courts] are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed. This is particularly true, we repeat, in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion. It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand.

***Id.***

Moreover, upon review of the certified record, we believe that Appellant's claim that the trial court focused solely on the severity of the crime and, therefore, failed to issue an individualized sentence or consider Section 9721(b)'s factors, to be belied by the record. In issuing Appellant's sentence, the trial court set forth its reasoning during the May 29, 2024 sentencing hearing as follows:

> So these comments are with respect to my sentence on Count [one]. As I said at the beginning, I have thoroughly reviewed

all of the written submissions, including the pre-sentence investigation report, the probation with restrictive conditions report, the sentencing memorandums, including the Commonwealth's supplemental sentencing memorandum, and I considered all of the recommendations made in those writings.

[Appellant] caused very serious injuries to the victim, her mother, and those injuries were both physical and mental, and I feel that the pain that the victim has experienced due to the neglect and lack of proper care given by [Appellant] is unimaginable.

I [can] not imagine the pain that the victim was in on a daily basis in the hands of her daughter during this period of time. I [am] mindful of the fact that the victim was 84 years old and defenseless. She was entirely dependent on somebody else for all of her everyday needs, including feeding her, bathing and toileting. She was bedridden. She was unable to turn herself, unable to ambulate, unable to call somebody else on the telephone for help, unable to take her medications, and I, you know, read that. This was all an assessment by Center Home Care done in April of 2022.

I [am] very mindful of the fact that [Appellant] was in a position of trust and responsibility for the victim, her mother, and that [Appellant] did not lack the ability to obtain help in caring for her mother.

In fact, she refused the help that was available to her, available at no cost. She cancelled at least five skilled nursing visits just eight days before the hospital admission, the final hospital admission that alerted the authorities to the conditions.

[Appellant] canceled all of the services from Centre Home Care. The records indicate that when Centre Home Care came to do the discharge evaluation, [Appellant] would not allow them into her residence. So that [is] why a phone discharge occurred.

I understand, as stated by [Appellant's counsel], that the victim may have wanted to be in her home, but I do not believe that

- 13 -

the victim wanted to be in the home under the circumstances to which she was subjected by the lack of care.

In considering the sentence, I [am] mindful of the sentencing guidelines, and the sentencing guidelines for this offense in the standard range of 22 to 36 months confinement with plus or minus [12] months for either aggravating or mitigating circumstances.

I do agree that mitigation is not appropriate in this case. I believe that aggravated circumstances do exist. I do believe that there are factors which take this out of the normal type of neglect for which the statute was written.

The wounds were tunneling to the bone. The legs were stuck together. There were maggots coming from the victim's vagina, and [Appellant] acknowledged that she saw maggots while the victim was in her home.

Additionally, [Appellant] was in a place of trust and care for her mother, and she violated that trust significantly, and she had help available, and she in essence shut the door on that help.

This is not a situation where she was unknowing and unable to get the help that she needed to care for her mother. She refused it, and the victim was 84 years old and unable to summon any of the help she needed on her own while, I believe, she was laying in a bed in potentially excruciating pain.

I [am] also, though, mindful of the fact that [Appellant] has no criminal history, and in this offense, her prior record score is a zero, and there are no allegations of alcohol or drug addiction or misuse, and there are no mental health diagnosis for which [Appellant] requires rehabilitation based on the material available to me.

And I understand, as stated by [Appellant's counsel], that [Appellant's] harmful actions were directed to one very unfortunate person, not to the community at large, but I believe that the gravity of the offense, especially as impacted the victim, is severe, and I do believe that a lesser sentence would depreciate the seriousness of the crime.

I feel that the circumstances – and not those that I just stated, there are more beyond that – are atypical of the crime for which [Appellant] plead *nolo contendere*, and so a more severe punishment is warranted, and this takes us into the aggravated range.

I am mindful, though, of [Appellant's] lack of a prior record and that this impacted, as I [have] said earlier, one very unfortunate victim, not the community at large, except for, you know, we must be mindful that the community might quite understandably be emotionally shaken and saddened by these events.

So I do [not] think we can say community is not impacted at all, but I understand that the actions were toward one victim, and so with those factors, I am not comfortable – or I do not believe that, you know, a five-year sentence as suggested by the [Commonwealth] is appropriate.

But I do believe that this fits in the aggravated range, and therefore, I [have] entered the sentence I did.

N.T. Sentencing, 5/29/24, at 29-33 (emphasis added).

The foregoing demonstrates that the trial court explicitly considered Section 9271(b)'s factors when it imposed Appellant's sentence in this case. Indeed, the court, while mindful of Appellant's character and lack of criminal history, determined that the gravity of the offense, as well as the rehabilitative needs of Appellant, warranted a sentence in the aggravated range. Moreover, the trial court specifically considered the fact that the crime did not, in an obvious sense, impact the community at large, and, for this reason, the court did not adopt the Commonwealth's proposed sentence. ***See id.*** at 33 (explaining that the court understood that "the actions were toward one victim" and "not the community at large" and, as such, it did not believe that

"a five-year sentence as suggested by the [Commonwealth was] appropriate."). Appellant's claims to the contrary are therefore belied by the record. As such, Appellant's claim fails.

Judgment of sentence affirmed. Jurisdiction relinquished.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 8/25/2025